DSI CORPORATION, a California Corporation; Sanford B. Weiss; Woodland Development Co., a Joint Venture; and Terra Linda Meadows, a Partnership

v.

The UNITED STATES.

No. 275–79C.

United States Court of Claims.

July 29, 1981.

James J. Feder, Los Angeles, Cal., atty. of record, for plaintiffs.

Richmond I. McKay, Washington, D. C., with whom was Acting Asst. Atty. Gen. Thomas S. Martin, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, NICHOLS and KUNZIG, Judges.

## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' FIRST CAUSE OF ACTION AND PLAINTIFFS' CROSS–MOTION FOR PARTIAL SUMMARY JUDGMENT

NICHOLS, Judge:

This case, here by transfer from the Northern District of California, is before the court after oral argument on the parties' cross-motions for summary judgment. They relate to the first cause of action only. The issue presented is whether the government's act as a holder of a second mortgage in challenging the validity of a first mortgage effects a taking or breaches a contract. For the reasons discussed herein, we find no government liability under either theory.

In 1966, plaintiff Woodland Development Company (Woodland), a joint venture, began construction of a 262 unit multifamily housing project for the elderly known as the "Park Lane" located in Monterey, California. The joint venture was comprised of O.D.C. Parklane, Inc. and plaintiff Sanford B. Weiss. The purchase was financed by the Fidelity Bank of Beverly Hills, California (Woodland-Fidelity note) in the amount of $6,400,300 at 5¼ percent interest, secured by a real property mortgage on the Park Lane. The Secretary of Housing and Urban Development (HUD) issued a commitment for insurance of the loan pursuant to Section 231 of the National Housing Act, 12 U.S.C. § 1715v. HUD endorsed the note on December 19, 1967. On December 19, 1967, to secure the amount owed for personal property received, Woodland executed a $190,000 note and chattel mortgage to Project Management Company (PMC), a wholly-owned subsidiary of plaintiff DSI Corporation of which plaintiff Weiss was the sole shareholder. PMC later was merged into DSI. Woodland also executed a purportedly subordinate mortgage on these same chattels as additional security for the Fidelity Bank loan. Fidelity Bank thereafter assigned the Woodland note and chattel mortgage to the New York State Employees' Retirement Fund. On July 1, 1968, Weiss became the sole proprietor of the Park Lane. In July 1968, Woodland defaulted on its mortgage payments, and on October 28, 1968, HUD was assigned the Woodland-Fidelity note and the Fidelity chattel mortgage.

On April 29, 1969, the United States on behalf of HUD commenced a foreclosure action against Woodland and Weiss on both the realty and chattel mortgages assigned to HUD. In that action, the government attacked the PMC chattel mortgage as a fraud and void for lack of consideration, alleging PMC and Woodland were mere alter egos of Sanford Weiss. The district court in *United States v. Woodland Development Co.*, No. C–51248 (N.D.Cal.1969), issued an order granting the United States immediate possession of the Park Lane and all property located therein for the purpose of managing the property as mortgagee in possession. In that foreclosure action, Weiss filed a series of counterclaims alleging government mismanagement, breach of contract, and tortious activities. On August 6, 1973, Woodland and Weiss filed suit against the Secretary of HUD in *DSI Corp. v. Secretary of HUD*, Civil Action No. C–73–1349–RFP (N.D.Cal.), raising the same issues as in their counterclaims in the foreclosure action.

On August 13, 1974, Judge Peckham of the United States District Court of Northern California dismissed Woodland's counterclaim and ordered foreclosure. That decision did not resolve the priority dispute over the chattel mortgages. During the period of government possession of Park Lane, the government utilized the personal property secured by the PMC chattel mortgage and made no payment to PMC. As the district court's decision did not address the validity of the PMC chattel mortgage and the government wanted to sell the Park Lane without a cloud on the title of the personal property located therein, the government decided to negotiate with DSI to obtain clear title. Pursuant to the agreement, DSI foreclosed its interest on the PMC chattels and purchased that property at the foreclosure sale on March 30, 1976. On June 1, 1976, HUD purchased the DSI chattels for $165,000.

On April 18, 1975, the district court in *DSI Corp. v. Secretary of HUD, supra,* entered a judgment of dismissal against plaintiffs on jurisdictional and other grounds. On appeal, the court upheld the dismissal on jurisdictional grounds, but remanded the case to the district court for the purpose of determining the appropriateness of a transfer to this court. *DSI Corp. v. Secretary of HUD,* 594 F.2d 177 (9th Cir. 1979). The district court thereupon transferred the case to this court.

Before us, plaintiffs complain of two ramifications of the government's action in challenging the validity of the Woodland-PMC chattel mortgage. Plaintiffs first complain that they were denied the use or income from the chattels secured by the PMC mortgage as a result of Judge Peckham's order granting the government possession. Second, plaintiffs contend that because the chattel mortgage assigned to defendant was a second mortgage, various contracts and the theory of estoppel by deed required the government not to attack the validity of the first mortgage. When the government did, in fact, challenge the first mortgage, plaintiffs say the government breached various contracts. Additionally, plaintiffs urge we find a taking without compensation because the government's attack on the PMC chattel mortgage destroyed its value to plaintiffs.

1. *Judge Peckham's order.*

Judge Peckham's order in the 1969 foreclosure action granted the United States immediate possession of the Park Lane and all property located therein. Seven years later, PMC foreclosed on the chattel property; but during that 7-year interim period, PMC argues it was not paid for the value of the government's use of the property and hence was subjected to a taking.

■ On these facts, plaintiffs have demonstrated no taking. When the government "takes" property, it exercises its right as sovereign to acquire property from the rightful owner for the public good. *See, e. g., Pollard v. Hagan,* 44 U.S. (3 How.) 212, 11 L.Ed. 565 (1845). Such an exercise is distinct from the right of ultimate ownership. *Kohl v. United States,* 91 U.S. 367, 23 L.Ed. 449 (1875). In the instant case, however, the government did not exercise its sovereignty and expropriate private property from the rightful owner. Instead, the government asserted a claim of right to the property, *i. e.,* that it was entitled to be the rightful owner of the property as the only holder of a valid mortgage on the property and that DSI had no rights in the chattel because its mortgage was void. In essence, this case involved a contest between two parties over conflicting claims of ownership. On such facts, it is axiomatic that there is no taking where, pursuant to court order, the government is in possession of property to which it asserts a claim of rightful ownership.

It is true we have recently held that this court will take jurisdiction of a title dispute under a taking theory when the government is in possession asserting itself to be the owner and under claim of right. *Bourgeois v. United States,* 212 Ct.Cl. 32, 545 F.2d 727 (1976). A note in *Malone v. Bowdoin,* 369 U.S. 643, 647 n.8, 82 S.Ct. 980, 983 n.8, 8 L.Ed.2d 168 (1962) says that this remedy is available, though previous law

was to the contrary. *See* Section II, *The United States Court of Claims, a History*, at 45 and ff, 216 Ct.Cl. at 45. But there is no authority to hold that an effort by the United States to assert its right to property in a noneminent domain judicial proceeding is itself a taking, and the view that so doing of itself exercised the power of eminent domain would be wholly unwarranted. The government is voluntarily submitting its claim to the scrutiny of the court and impliedly is agreeing to abide by the outcome of the trial. Nor is the decision by the government to hold on to property physically, awaiting the outcome of judicial proceedings a taking. *Cf.* 28 U.S.C. § 2409a. We suppose that in appropriate cases it would be the duty of the court in which that proceeding was pending to determine title to mitigate any harsh result from the government's protecting itself in this manner. Lastly, plaintiffs cite the case of *Armstrong v. United States*, 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960) as support for the proposition that PMC's property interest as a senior lien holder is protected from a taking without just compensation. *Armstrong*, however, is inapposite to plaintiffs' situation. In *Armstrong*, a shipbuilder defaulted on its construction contract with the government. Upon default, the government acquired title to the ship. Prior to default, however, Armstrong had acquired a valid materialmen's lien and sued for the taking of the value of that lien. The Court held that the lien had attached to the ship, but upon seizure by the government Armstrong's lien on the ship could not be enforced and thus became worthless. Such an action amounted to a taking of the value of the lien. In the instant case there was no similar activity. Here the government sued to foreclose on both real property and personal property. The government was given possession of the personal property pursuant to court order. Finally, the parties settled and plaintiffs were paid by the government for their property. This case would be more like *Armstrong* if the validity of the PMC chattel mortgage had not been in dispute and the government had prevented plaintiff from entering to foreclose on its property.

2. *Destruction of value of PMC chattel mortgage.*

Plaintiffs contend that the government attacks on the validity of the PMC chattel mortgage destroyed its value since no one would purchase a mortgage of questionable validity. Plaintiffs then argue that both the law and various contracts between plaintiffs and defendant require that the government not challenge the mortgage's validity. By doing this, the government is liable for a breach of contract if not a taking.

Plaintiffs cite a number of agreements to attempt to show the government explicitly and impliedly agreed it would not challenge the validity of the PMC chattel mortgage:

(1) *A regulatory agreement entered into between Woodland and the government* —Under this agreement Woodland was permitted to furnish the Park Lane through chattel mortgage financing. Any chattel mortgage taken out on such personal property was required to give the Fidelity Bank (or the government as its successor) the opportunity to assume the financing upon default of the mortgagor, Woodland Development Company.

(2) *PMC-Fidelity Bank Inter-Credit Subordination Agreement*—Plaintiffs allege Fidelity Bank agreed to recognize a senior lien in favor of the PMC chattel mortgage.

(3) *Woodland-Fidelity Bank Chattel Mortgage*—Plaintiffs allege this agreement states on its face it is subordinate to the PMC chattel mortgage.

(4) *Fidelity Bank-Federal Housing Administration Commitment for Insurance* —Plaintiffs allege this agreement provided that PMC was to be accorded lien status senior to the government.

Plaintiffs would construe these agreements to demonstrate that the government made a pledge not to challenge a prior mortgage even if the government later viewed the mortgage as invalid. For the government to agree not to challenge such a mortgage would be surprising since a

paramount concern of the government is protecting the public fisc from improper diminution.

■ We disregard the serious issues of contract privity these contentions raise. Simply as interpreting the agreements involved, with whomsoever made, plaintiffs' constructions are strained and unfounded. The regulatory agreement merely required that any chattel mortgages contain a provision allowing the real property mortgagee to assume the payments due should Woodland default. Such a provision was probably inserted to allow a mortgagee in possession to make payments due on the property secured by the chattel mortgage. Without such a requirement, the holder of the chattel mortgage might foreclose on personal property necessary for the continued operation of the project by a mortgagee in possession. This contract reasonably read and interpreted cannot be said to contain any guarantee by the government not to challenge the validity of the PMC mortgage. The PMC-Fidelity agreement merely stated that PMC held a lien senior to that of Fidelity, and that PMC would provide notice of any default by Woodland and allow Fidelity the opportunity to assume Woodland's interest. The agreement has no bearing at all on the issue of challenging the mortgage. Likewise, we have examined the Woodland-Fidelity Bank agreement and the Fidelity Bank-FHA commitment for insurance and find nothing to indicate these agreements should be read as a contractual agreement that the PMC chattel mortgage would not be challenged.

Even if these contracts do not expressly indicate any government agreement concerning the PMC chattel mortgage, plaintiffs argue there were implied in fact agreements. Plaintiffs state that HUD originally would have required the financing of the personal property necessary for the basic operation of the Park Lane be accomplished through an escrow deposit of $190,615. Following Woodland's request, the government allowed the substitute method of financing by chattel mortgage. Plaintiffs then argue that by relying on this government authorization, Woodland, PMC, Fidelity, and the government entered into an agreement, and the court should imply in fact a contract by the government not to challenge the PMC mortgage.

We find no merit to plaintiffs' argument. An implied in fact agreement is one "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Algonac Manufacturing Co. v. United States*, 192 Ct.Cl. 649, 673, 428 F.2d 1241, 1255 (1970), quoting *Baltimore & Ohio RR v. United States*, 261 U.S. 592, 597, 43 S.Ct. 425, 426, 67 L.Ed. 816 (1923). In the instant case, we see no tacit understanding arising from the conduct of the parties and the surrounding circumstances that imply the government would not later challenge the validity of a mortgage it thought invalid on the grounds of fraud not previously known to it.

Plaintiffs' last contract claim, based on a third party beneficiary theory is equally without merit. Plaintiffs contend that PMC was a direct third party beneficiary of the various agreements described above. However, our analysis above shows there was no contractual pledge contained in any of the agreements not to challenge the PMC mortgage. Plaintiffs, therefore, cannot claim to be third party beneficiaries of phantom agreements.

■ Closely related to plaintiffs' contract arguments is plaintiffs' contention that it can recover under the theory of estoppel by deed. Under that doctrine, a mortgagee is estopped from attacking the validity of a prior mortgage if the mortgage held by the subsequent mortgagee expressly recites it is subject to the prior mortgage. *E. g., Territory of Alaska v. Guerin*, 140 F.Supp. 440 (D.Alaska 1956). Based on equitable notions, the doctrine prevents a party from taking a position contrary to an earlier assertion. 28 Am.Jur.2d § 5.

When plaintiffs' petition is stripped of its legal maskings, plaintiffs' only arguable claim of recovery is based on this equitable

theory. Plaintiffs state the government agreed to allow chattel mortgage financing, and Woodland and PMC thereupon did so. To provide Fidelity with additional security for its real property loan, Woodland signed a second chattel mortgage to Fidelity. Plaintiffs stress they received no additional loan money from Fidelity because of this second mortgage. Then, in the foreclosure action, the government would nullify this chattel mortgage of which it was all along well aware. Because of this government challenge and subsequent litigation, plaintiffs received no payments on the note secured by the chattel mortgage. When the government finally allowed foreclosure 7 years later, plaintiffs only received $165,000 for the property that acted as security for the $190,000 note. Such is the grievance.

Suppose the asserted estoppel by deed were effective against private mortgagees, which we do not hold, we do not agree that the doctrine is properly invoked to prevent defendant United States from challenging on grounds of subsequently discovered fraud a chattel mortgage it has previously acknowledged as paramount to its own interest in the chattels. This variety of equitable estoppel is not now highly regarded if it stands in the way of any important public policy. Thus, a patent licensee was once viewed as estopped by accepting the license from attacking the validity of the patent, but in *Lear, Inc. v. Adkins*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), the Supreme Court overruled prior authority and on policy grounds snatched away this portion of a patentee's defensive panoply. The government is generally viewed as not subject to be frustrated by its officer's laches or estoppel from enforcing public rights. *Utah Power & Light Co. v. United States*, 243 U.S. 389, 409, 37 S.Ct. 387, 391, 61 L.Ed. 791 (1917). Another leading case is *Costello v. United States*, 365 U.S. 265, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961) in which it was held government laches could not be invoked as a bar to revocation of an alien's naturalization obtained by fraud. In *Lane v. United States*, 226 Ct.Cl. ——, 639 F.2d 758 (1981) we recognized the existence of the general rule we rely on here, but declined to apply

it in the special circumstances there presented, which included the fact that the public right there granted was not related to fraud and was not based on positive statute or positive contract or property rights, but was itself a judge made equitable doctrine. There can be no doubt but that the prevention or correction of fraud on the government is a matter of high public policy expressed but not exhausted in numerous statutory provisions. *United States v. Acme Process Equipment Co.*, 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966); *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961). We note, of course, that no fraud has been established here. Our concern is simply the stifling effect that the alleged estoppel by deed would have on corrective judicial investigation and action in instances where government officials supposed fraud had occurred, and under the head of fraud we include such related illegalities as kickbacks and conflicts of interest. The asserted equitable estoppel by deed would aid in the effectuation of frauds on the United States if it had the consequences asserted here. For this reason we have much difficulty picturing any federal court, including this one, allowing such consequences to obtain. Our conclusion is that federal officers lack authority and power to bind their successors by laches or estoppel not to take action to correct what they believe to be fraud on the government, in any of its aspects.

Even if the doctrine could be invoked against the government, plaintiffs could not recover. A claim based on estoppel by deed is not based on the contract between the parties, but is instead implied by law on the basis of equitable notions. 28 Am.Jur., *supra*. Any monetary claim implied in law is beyond our jurisdiction. *E. g. Porter v. United States*, 204 Ct.Cl. 355, 496 F.2d 583 (1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975). Also, the doctrine is not used as a peg to which a party can attach a claim for monetary damages, but instead is used to prevent a party from denying certain facts. If the doctrine were

applicable to the government in this case, its use would have been limited to a ruling on the merits of the dispute between PMC and the government over the chattel mortgage. It alone would not provide a contract theory of recovery to plaintiffs.

Therefore, for the reasons discussed above, we find that respecting the first cause of action, the government neither took any of plaintiffs' property without just compensation, nor breached any contract with plaintiffs, nor was bound by estoppel not to challenge the chattel mortgage. Plaintiffs' motion for summary judgment is denied. Defendant's motion for summary judgment is granted. The first cause of action of the petition is dismissed.