**YUBA GOLDFIELDS, INC. and Placer Service Corp.**

v.

**The UNITED STATES.**

**No. 460–80L.**

United States Claims Court.

Feb. 24, 1983.

---

John J. Dacey, San Francisco, Cal., for plaintiffs; Goldstein, Barceloux & Goldstein, San Francisco, Cal., of counsel.

Glen R. Goodsell, Washington, D.C., with whom was Asst. Atty. Gen., Carol E. Dinkins, Washington, D.C., for defendant.

## OPINION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

PHILIP R. MILLER, Judge:

Except as otherwise indicated, the facts which follow are taken from plaintiffs' petition filed in the United States Court of Claims August 28, 1980, plaintiffs' exhibits to their interrogatories served on defendant and the trial judge June 3, 1982, plaintiffs' pretrial submission served August 12, 1982, and the order in *Yuba Goldfields, Inc. v. United States,* Civil No. S–80–470 MLS (E.D.Cal.) filed June 2, 1981, denying defendant's motion for summary judgment.

In or about 1901 James O'Brien, plaintiffs' predecessor in interest, was the owner of fee title and/or valid unpatented mining claims in certain lands in Yuba County, California. By deed dated December 6, 1901, he quitclaimed to the United States all of his interest in the property with the exception of his interests in the precious metals thereon, which he reserved for himself.

Yuba Goldfields, Inc. (Yuba) acquired such reserved interests by quitclaim deed in 1905, and thereafter carried on dredging activities and other forms of mining on the property for the extraction of gold and other precious metals at such times as economic conditions and the cost of extraction warranted. From 1968 to 1975 due to high operating costs, Yuba temporarily ceased its extraction activities on the property but continued to secure and maintain the property, dredges and other mining equipment and to explore and develop the property.

In 1975, Yuba, having determined that appropriate economic conditions existed for resuming the extraction of precious metals from the property, wrote to the U.S. Army Corps of Engineers (the Corps) to make certain that Yuba's operations would be in compliance with all appropriate laws, regulations and standards which defendant was empowered to enforce.

The Corps responded by letter dated April 16, 1975, to Mr. Arthur F. Silbert, Yuba's president, stating in pertinent part:

In assembling title data for lands which may be involved in the Marysville project as authorized by PL 89–789, many ownerships of lands in this vicinity appear to be erroneously indicated on the Yuba County Assessor's records. These possible errors could have occurred because of the unusual granting clauses, reservations, and exceptions set out in the instruments which conveyed various degrees of title to the United States around the turn of the century. The United States originally acquired these various degrees of title to land necessary to the Yuba River Debris Control Project which provides for storage of mining debris within the river bed of the Yuba River to keep such debris from passing into the Feather and Sacramento Rivers. Project improvements consist of Daguerre Point Dam, training dikes, and other protective works to maintain the Yuba River in its confined channel from Parks Bar Bridge to its junction with the Feather River. There is a continuing requirement that no activities be conducted in the Yuba River which will interfere with this authorized project.

\*　　\*　　\*　　\*　　\*　　\*

This letter is notification to you that the Government does have valid interests in portions of the lands upon which you are apparently conducting your gold mining activities, as well as lands upon which you apparently plan to conduct future operations. You are therefore cautioned to conduct your operation in a manner which is consistent with existing laws. You are further notified that you will be held accountable for any removal of precious metals, sand, gravel, and other ma-

terials which may legally be the property of the United States.

In order to avoid future conflicts, it is suggested that you coordinate with and furnish us your proposed plan of operation including the location of your dredging operations. This coordination will undoubtedly be beneficial to both parties in identifying and resolving possible conflicts.

On April 9, 1976, the Corps wrote to Yuba's attorneys with copy to Mr. Silbert, stating insofar as pertinent:

The Department of Justice has now completed its review and the proposed plan of dredging operations map furnished by Mr. Silbert in his letter of 9 May 1975, has been annotated, copy enclosed, to show the decision of ownership by the US Attorney General's office. Based upon this decision, our rights in the dredging areas will be enforced as follows:

a. The areas crosshatched with horizontal lines represent areas owned in fee simple title by the United States for the Yuba River Debris Control Project with a reservation for the extraction of precious metals only. This reservation does not permit the removal of any material such as the sand and gravel. All materials, other than precious metals, dredged or extracted from the land shall be returned to the basins from which they are taken or else be deposited upon lands adjacent thereto, said materials shall be and remain the property of the United States.

b. The areas crosshatched with vertical lines represent areas owned outright in fee by the United States for the Yuba River Debris Control Project with no reservations in the title. Dredging activity or removal of any material, including precious metals is prohibited.

\*　　\*　　\*　　\*　　\*　　\*

From available information, it is our opinion that the dredge "Lisa" is operating in Section 28, T. 16 N., R. 5E., north of the Yuba River meander line on fee lands of the United States that are subject to a reservation of precious metals. It is our understanding from Mr. Silbert's letter that Yuba Goldfields has acquired this reserved right. We assume this claim is factual but have not verified it by documents of title.

If you believe you have information or data that would modify our decision, please forward it for our review.

On May 12, 1976, the Corps wrote again to Yuba's lawyers, stating in part:

Thank you for your letter of 27 April 1976 pertaining to land titles in the vicinity of your dredging operations near the Yuba River, Marysville, California. The property rights in the dredging area that were set forth in our letter of 9 April 1976 and detailed in subparagraphs a to c were obtained from the official records of the County of Yuba and the records on file in the Bureau of Land Management Office, Sacramento, California. The Attorney General's opinion was based upon a review of these records.

\*　　\*　　\*　　\*　　\*　　\*

It is recommended that you investigate the official records as to the accuracy of the land titles included in our letter of 9 April 1976. If you are unable to reconcile these matters, I will be pleased to arrange for a personal meeting as you suggested.

The government's position that Yuba no longer had the right to extract precious metals from the property was based upon the terms of the clause in the 1901 deed from James O'Brien to the United States, which reserved to the transferor and his successors in interest—

all precious metals on or in said premises with a right to extract the same . . . provided that at any time such portions of said premises as shall have been already worked over, shall be available for use by the United States as a settling basin, on condition that said use shall not interfere with the mining of the remainder of said premises; and provided further that in any case all of said premises shall be available for use as a settling basin without restriction on and after January 1, 1952.

The government's position was that under the above quoted clause Yuba's interest had terminated on January 1, 1952, whereas Yuba contended that the clause did not terminate its interest and that, in any event, the government was not entitled to any rights thereunder, because at no time did it plan, intend to or actually use the property for purposes of a settling basin.

Plaintiffs state that in late summer 1976 they initiated settlement negotiations with the government for a proposed exchange of property, and that such negotiations continued through 1977 and resulted in the execution on January 24, 1979, of an "Agreement for the Exchange of Land" by Yuba and the Corps' District Engineer, subject to the approval of the Secretary of the Army. The approval of the Secretary not having been received by June 12, 1980, on that date Yuba filed a declaratory relief action against the United States in the United States District Court for the Eastern District of California pursuant to 28 U.S.C. § 2409a, to obtain a judicial declaration that its rights to the mineral interest had not been terminated.

On August 28, 1980, Yuba and Placer Service Corp. contemporaneously filed in the Court of Claims the petition in this case claiming that the government's assertion that their mineral interests had been terminated and that they no longer had any right to the extraction of precious metals from the property was a taking of their property for which the Fifth Amendment to the Constitution entitled them to just compensation, of at least ten million dollars. The petition stated that Placer Service Corp. had joined with Yuba as plaintiffs because on or about October 15, 1979, it had formed a joint venture with Yuba for the purpose of extracting the precious metals and that the government's interference with Yuba's property rights also deprived it of the value of its joint venture.

On June 2, 1981, the District Court for the Eastern District of California resolved the dispute as to plaintiffs' right to continue to mine the property in favor of Yuba, holding that Yuba's right did not terminate on January 1, 1952, but that it merely became subject to the right of the United States to use the tract for a settling basin, whether or not Yuba had completed mining operations thereon. On December 18, 1981, the government advised Yuba that it had decided to dismiss its protective appeal from the district court order, and on January 4, 1982, the United States Court of Appeals for the Ninth Circuit dismissed such appeal.

Although plaintiffs did not amend their petition to reflect the changed circumstances, in their pretrial submission served August 13, 1982, pursuant to the Court of Claims' standard pretrial order on liability, they now contend that they are entitled to just compensation for the temporary taking of their property from April 9, 1976, until January 4, 1982, in that "defendant engaged in actions and a course of conduct which interfered with and blocked plaintiffs' use [of], development [of] and economic return on" their interests.

Defendant's motion for summary judgment must be granted.

The simple answers to plaintiffs' contentions are:

(1) The government did not take property belonging to plaintiffs, but only asserted a claim to its rightful ownership subject to judicial determination. It did not take possession of the subject property, nor did it physically bar plaintiffs from its use. At most, defendant told Yuba that it would hold plaintiffs accountable for the value of any of the government's property which plaintiff extracted. Neither in its pretrial submission nor its brief in opposition to the motion do plaintiffs allege any actions by the United States which amount to more than the bona fide assertion of a claim of right. Such an assertion by a private individual would not have been deemed a taking by a private individual; it is not a taking by the United States when it acts in good faith to protect what it deems to be its property.

■ (2) Equally important, the Fifth Amendment does not require compensation

for actions by the United States which do not amount to a taking of property pursuant to its authority as sovereign but are only for the purpose of protecting its property in its proprietary capacity.

Both of these rulings are clearly supported by the decision of the Court of Claims in *DSI Corp. v. United States,* 228 Ct.Cl. ——, 655 F.2d 1072 (1981). There plaintiffs had been the holder of a first mortgage and the United States the holder of a second mortgage on the same property. In 1969, the United States commenced a foreclosure action in a federal district court and in that proceeding attacked plaintiff's first mortgage as a fraud and void for lack of consideration. The district court granted the United States immediate possession of the property for the purpose of managing the property and in 1974 ordered foreclosure of the government second mortgage, but did not address the validity of plaintiff's first mortgage. Because the government wanted to convey the property free of any cloud on title, in 1976 it negotiated a settlement with plaintiff, pursuant to which plaintiff foreclosed its first mortgage and purchased the property at the foreclosure sale, and the government then purchased the property from plaintiff for a cash sum. Plaintiff then brought suit against the government for just compensation for a temporary taking for the 7-year period 1969–76 because the government had the value of the use of the property while plaintiff was deprived of the use and income therefrom. The Court of Claims granted summary judgment for the government, explaining (228 Ct.Cl. at ——, 655 F.2d at 1074–75):

> On these facts, plaintiffs have demonstrated no taking. When the government "takes" property, it exercises its right as sovereign to acquire property from the rightful owner for the public good. *See, e.g., Pollard v. Hagan,* 44 U.S. (3 How.) 212, 11 L.Ed. 565 (1845). Such an exercise is distinct from the right of ultimate ownership. *Kohl v. United States,* 91 U.S. 367, 23 L.Ed. 449 (1875). In the instant case, however, the government did not exercise its sovereignty and ex-

propriate private property from the rightful owner. Instead, the government asserted a claim of right to the property, *i.e.,* that it was entitled to be the rightful owner of the property as the only holder of a valid mortgage on the property and that DSI had no rights in the chattel because its mortgage was void. In essence, this case involved a contest between two parties over conflicting claims of ownership. On such facts, it is axiomatic that there is no taking where, pursuant to court order, the government is in possession of property to which it asserts a claim of rightful ownership.

> * * * [T]here is no authority to hold that an effort by the United States to assert its right to property in a noneminent domain judicial proceeding is itself a taking, and the view that so doing of itself exercised the power of eminent domain would be wholly unwarranted. The government is voluntarily submitting its claim to the scrutiny of the court and impliedly is agreeing to abide by the outcome of the trial. Nor is the decision by the government to hold on to property physically, awaiting the outcome of judicial proceedings a taking. *Cf.* 28 U.S.C. § 2409a.

*Accord: Sun Oil Co. v. United States,* 215 Ct.Cl. 716, 768–70, 572 F.2d 786, 817–19 (1978).

■ Plaintiffs rely principally on *Foster v. United States,* 221 Ct.Cl. 412, 607 F.2d 943 (1979), to support their argument that the government's assertion of an unsustained claim of right to plaintiffs' mineral interests constituted a compensable taking under the Fifth Amendment. But *Foster* does not aid them. There the government had acquired land for use as an Air Force base under a deed reserving to the grantors rights to "oil, gas, asphaltum and other hydrocarbon substances and other minerals." When the grantors' successors in interest sought to mine dolomite on the land, the Air Force excluded them on the ground that dolomite was not included in the enumerated substances. After the court found that dolomite was properly included in "oth-

er minerals," it held that plaintiffs were entitled to compensation for the permanent taking of their mineral rights. The substantial difference between the two cases lies in the facts that while here the government merely asserted what it viewed to be its proprietary interest under a deed only as long as necessary to obtain a judicial determination thereof, in the same way as any private owner might, and gave up when the court ruled against it, in *Foster* the United States totally and permanently withheld from the plaintiffs access to their mineral deposit during the controversy and then asserted its right as sovereign to disregard the court's ruling no matter what the outcome. Expositive of this is the court's statement that (221 Ct.Cl. at 425–26, 607 F.2d at 950–51):

> In order to quarry the dolomite, plaintiffs would require the use of military reservation roads to which defendant has indicated that no access would be allowed due to its detrimental impact on base operations. The Government has taken this position despite the 1942 deed's explicit reservation of necessary privileges on roads and retention of easements. Furthermore, blasting operations would interfere with missile tracking radar systems, operation of the control station and Vandenburg's reservoir, and create hazards in missile launching operations.
>
> In effect, the use of Tract 83 as a part of an air force base is incompatible with its use as a dolomite quarry.

Plaintiffs also cite two other cases in support of their position: *Bourgeois v. United States,* 212 Ct.Cl. 32, 545 F.2d 727 (1976) and *Yaist v. United States,* 228 Ct.Cl. ——, 656 F.2d 616 (1981).

In *Bourgeois,* decided 5 years prior to *DSI,* the government "posted" an island claimed by plaintiff, as government-owned land and wrote plaintiffs' attorney to the same effect. Plaintiff also alleged in support of his motion for summary judgment that the government ordered her off the property, excluded her son, and refused to allow her to install electricity on the land. (212 Ct.Cl. at 40, n. 4, 545 F.2d at 731, n. 4.)

Plaintiff claimed compensation for a permanent taking. Two of the three judges on the panel thought such allegations sufficient to give the court jurisdiction of the petition as one claiming a taking rather than merely one to adjudicate a disputed title (within the exclusive jurisdiction of the federal district courts). Judge Nichols, who subsequently wrote the opinion in *DSI,* was the concurring judge in the majority opinion in *Bourgeois.* Therefore, his basis for distinguishing *Bourgeois* is particularly significant. He stated that although *Bourgeois* involved a title dispute it was one in which "the government is in possession asserting itself to be the owner" and that "there is no authority to hold that an effort by the United States to assert its right to property. in a noneminent domain judicial proceeding is itself a taking, and the view that so doing of itself exercised the power of eminent domain would be wholly unwarranted." (*DSI Corp., supra,* 228 Ct.Cl. at ——, 655 F.2d at 1074, 1075.)

*Yaist* was decided the same day as *DSI* (July 29, 1981) by a different panel (although one judge sat on both panels), but neither opinion mentions the other. The court held that it could try title to land in a suit for just compensation as long as there was an actual taking by the government. It found such a taking in the government's filing of its deed with the county records office, the government's representation to the court that if the title determination was adverse to it the government would retain possession and pay just compensation under the condemnation law, the existence of Congressional authority to obtain the land by condemnation, and a letter to plaintiff that the government intended to acquire the land. *Yaist, supra,* 228 Ct.Cl. at ——, 656 F.2d at 621, n. 4.

■ Apart from the claim of temporary taking compensable under the Constitution, plaintiffs suggest no alternative theory under which this court would have jurisdiction to award them a judgment for damages they claim they sustained because of their failure to extract precious metals from the land at issue during the existence of the

title dispute, from 1975 to 1981. Congress has limited the jurisdiction of this court to specific kinds of cases and it is not apparent how plaintiff's claim would fall within any of them. *See* 28 U.S.C. § 1491.[1]

Accordingly, the clerk is directed to enter summary judgment for defendant dismissing the plaintiffs' petition. Since the petition was originally filed in the Court of Claims, which did not award costs, no order awarding costs will be entered herein.

---

1. Mere loss of opportunity for profit from use of the land or increased expense would not be compensable as a taking. *United States v. Central Eureka Mining Co.*, 357 U.S. 155, 168, 78 S.Ct. 1097, 1104, 2 L.Ed.2d 1228 (1958); *Deltona v. United States*, 228 Ct.Cl. ——, 657 F.2d 1184 (1981), *cert. denied*, 455 U.S. 1017, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982); *Laney v.*

*United States*, 228 Ct.Cl. ——, 661 F.2d 145 (1981). In *DSI Corp., supra*, 228 Ct.Cl. at ——, 655 F.2d at 1075, the court supposed that in an action to determine title "it would be the duty of the court in which that proceeding was pending * * * to mitigate any harsh result from the government's protecting itself in this manner." *See* 28 U.S.C. § 2409a.