MARKEY, Chief Judge.
 

 Appeal from an order of the Claims Court, 1 Cl.Ct. 421, dismissing the complaint in light of a motion of the United States for summary judgment, on the ground that actions of the United States did not constitute a taking of private property. We vacate the order and remand.
 

 BACKGROUND
 

 In 1901, James O’Brien quitclaimed the subject property to the United States, reserving to himself the precious metal interests. In 1902, those interests were conveyed to R.D. Evans, who in turn conveyed them to Yuba Goldfields, Inc., in 1905, which thus owned the right to extract precious metals from an area of land the underlying fee in which is owned by the United States. Yuba Goldfields, Inc. (herein, with its joint venturer Placer Service Corp., called “Yuba”) mined the area continuously (with minor interruption) since 1905. In 1975 and 1976, the U.S. Corps of Engineers wrote Yuba, stating,
 
 inter alia,
 
 that Yuba had no extraction or other rights, that Yuba would be held accountable for removal of
 
 *886
 
 any precious metals that may legally belong to the government, that in view of a decision by the Attorney General of the United States the government’s ownership of the precious metals would be enforced, and that “Dredging activity or removal of any material, including precious metals is prohibited.”
 

 In extended negotiations, the United States adhered to its position that Yuba had no rights and that the United States’ asserted rights would be strictly enforced. By 1979, Yuba and the Corps of Engineers reached and signed an agreed settlement. That settlement died, however, when the Secretary of the Army declined to approve it.
 

 On June 12,1980, Yuba sued in the United States District Court of California (No. Civ. 80-480 MLS) to confirm its title to the mineral interest. Yuba also petitioned in the Court of Claims (No. 40-80L), seeking just compensation for the period of time (since 1976) over which it had been denied opportunity to mine the area by what it viewed as the temporary taking of its mineral interest in violation of the Fifth Amendment to the Constitution. The petition was transferred to the Claims Court as required by 28 U.S.C. § 171, as
 
 amended by
 
 Federal Courts Improvement Act of 1982, Pub.L. No. 97-164, § 403(a), 96 Stat. 25, 57.
 

 On August 10, 1981, the district court granted summary judgment to Yuba, holding that the claim of the United States to the mineral right was unsound. The United States dismissed its appeal from that judgment on January 4, 1982. Since that date, Yuba has been free to again exercise its right to extract precious metals from the land.
 

 In the Claims Court, the United States filed what it called a “Motion for Summary Judgment.” Accompanied by no affidavits, the motion partook more of the nature of a motion to dismiss. In view of the action of the Claims Court now on review, however, dispute on the proper label for the United States’ motion is in this case academic.
 

 The Claims Court
 

 By way of summary judgment, the Claims Court denied all relief to Yuba for the six years during which it claimed it was prevented by the United States from exercising its property right to extract precious metals from the area. That judgment was accompanied by an opinion establishing that the motion was not granted on grounds raised in the United States’ motion, but on the following views of the trial judge:
 

 (1) There was no taking because the United States “did not take possession of the subject property, nor did it physically bar plaintiffs from its use.”
 

 (2) There was no taking where, as here, the United States “acts in good faith to protect what it deems to be its property.”
 

 (3) There is no liability because the United States acted in a proprietary rather than in a sovereign capacity.
 

 The Claims Court opinion says: (a) the action of the United States here was one in which it “only asserted a claim to its rightful ownership subject to judicial determination;” (b) that “at most” the United States told Yuba it would be held accountable for government property extracted; (c) that such an assertion by a private individual would not be deemed a taking; (d) that the Fifth Amendment does not require compensation for actions by the United States that are not a taking pursuant to its authority as sovereign. The opinion cited as authority
 
 DSI Corp. v. United States,
 
 655 F.2d 1072, 228 Ct.Cl. 299 (1981) and
 
 Sun Oil Co. v. United States,
 
 572 F.2d 786, 215 Ct.Cl. 716 (1978), and discussed what were viewed as factors distinguishing
 
 Foster v. United States,
 
 607 F.2d 943, 221 Ct.Cl. 412 (1979),
 
 Bourgeois v. United States,
 
 545 F.2d 727, 212 Ct.Cl. 32 (1976), and
 
 Yaist v. United States,
 
 656 F.2d 616, 228 Ct.Cl. 281 (1981), relied upon by Yuba. Other than their appearance in an extended quotation of the Corps of Engineers’ letters, the United States’ statements that its rights would be “enforced” and that Yuba’s dredging operations were “prohibited” are not referred to in the opinion.
 

 
 *887
 

 Issue
 

 Whether the Claims Court erred in its grant of summary judgment.
 

 OPINION
 

 We deal here with government action differing from a straight forward exercise of the eminent domain power to condemn and acquire a citizen’s property. Over the years courts have recognized that the Fifth Amendment requirement for payment of just compensation is equally applicable to government action otherwise labeled but having the effect of such exercise.
 
 See Eyherabide v. United States,
 
 345 F.2d 565, 170 Ct.Cl. 598 (1965) and cases cited therein. Thus a “taking” may result not only upon exercise of the power of eminent domain, but also upon government action describable as “inverse condemnation.”
 

 As the literature emphasizes, the law of just compensation is hardly a model of clarity. Professor Arvo Van Alstyne describes it as “[w]ith some exceptions ... largely characterized by confusing and incompatible results, often explained in conclusionary terminology, circular reasoning, and empty rhetoric.” Van Alstyne,
 
 Taking or Damaging by Police Power: The Search for Inverse Condemnation Criteria,
 
 44 S.C.L.Rev. 1, 2 (1970). Professor Joseph Sax notes that “the predominant characteristic of this area of law is a welter of confusing and apparently incompatible results.” Sax,
 
 Takings and the Police Power,
 
 74 Yale L.J. 36, 37 (1964). In
 
 Griggs v. Allegheny County in Perspective: 30 Years of Supreme Court Expropriation Law,
 
 1962 Sup.Ct.Rev. 63, Professor Allison Dunham said decisions in this area are characterized by a “crazy-quilt pattern.” Professor Frank Michelman described just compensation law as “liberally salted with paradox,” and pointed to “jarring outcomes” that are “surprising to the uninitiated.” Michelman,
 
 Property, Utility, and Fairness: Comments on the Ethical Foundations of “Just Compensa
 
 tion" Law, 80 Harv.L.Rev. 1165, 1169-1170 (1967).
 

 Nor can this one opinion on review of a summary judgment be expected to replace decisional discord with harmony. Dissatisfaction of the writers with apparent disorder resulting from consideration of each case on its own facts will not be alleviated by a requirement that the present case be decided after trial on facts found by the trial judge and on legal conclusions based on those facts. That requirement is nonetheless dictated by the present record.
 

 The fact-intensive nature of just compensation jurisprudence to date, however disorienting in other contexts, argues against precipitous grants of summary judgment. There may well be just compensation cases in which the United States as the moving party is “entitled to judgment as a matter of law, and where it is quite clear what the truth is .... ”
 
 Sartor v. Arkansas Natural Gas Corp.,
 
 321 U.S. 620, 627, 64 S.Ct. 724, 728, 88 L.Ed. 967 (1944). There may be such cases. This is not one of them.
 

 (1) Non-possessional Taking
 

 The trial judge erred as a matter of law in concluding that there could be no taking where the United States “did not take possession” of the disputed property and did not “physically bar plaintiffs from its use.” No authority was or could be cited for that proposition. Indeed, the law is to the contrary. Neither physical invasion nor physical restraint constitutes a
 
 sine qua non
 
 of a constitutionally controlled taking.
 
 Penn Central Transp. Co. v. New York City,
 
 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).
 

 Beyond the irrelevancy of possession and restraint, the record does not support an assumption that they were absent here. The United States possessed the land and “prohibited” Yuba’s dredging. It is difficult to see what more might be done, other than dredging by the United States, to enable the United States to possess the minerals themselves. Similarly, no requirement for physical restraint would arise unless and until Yuba elected to defy its government’s prohibition and attempt to renew its dredging activities. Yuba should have the oppor
 
 *888
 
 tunity at trial to establish the validity of its argument here that a prudently conducted, publicly owned business corporation cannot be expected to undertake the risks it asserts were present in such defiance. On consideration of the motion, Yuba was entitled to that inference.
 
 United States v. Diebold, Inc.,
 
 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).
 

 The trial court’s view that possession and physical restraint were required caused it to distinguish
 
 Foster, supra,
 
 on irrelevant grounds. In
 
 Foster,
 
 the United States acquired land subject to mineral rights owned by certain citizens. When the citizens sought to mine dolomite, the United States excluded them on the ground that it was not one of the “other minerals” in the deed. When the United States lost the ensuing lawsuit, it exercised its power of eminent domain and acquired all rights. The trial court here said
 
 Foster
 
 was distinguishable because in that case the United States “totally and permanently withheld from the plaintiffs access to their mineral deposit during the controversy and then asserted its right as sovereign to disregard the court’s ruling,” while in the present case the United States merely asserted a claim “only long enough to obtain a judicial determination and gave up when the court ruled against it.”
 

 As indicated above, if the United States took possession or physically restrained plaintiffs in
 
 Foster,
 
 (and those facts are not clear from the opinion in that case) those circumstances would be irrelevant. Equally irrelevant in determining whether a taking by inverse condemnation occurred is what may have been the United States’ response, after the taking, to a court ruling against it, whether that response be acceptance, as here, or nullification by exercise of the eminent domain power as in
 
 Foster.
 

 As indicated below, there is no basis of record for the notion that the United States here prohibited Yuba’s exercise of its rights “only long enough to obtain a judicial determination.” Nor is there a basis for the court’s apparent distinction between a temporary and permanent deprivation in the analysis required for determination of whether a compensable taking has occurred.
 
 R.J. Widen Co. v. United States,
 
 357 F.2d 988, 174 Ct.Cl. 1020 (1966). That distinction may influence the amount of just compensation due; it has no relation to whether there was a taking which under the Constitution must be compensated in some amount.0
 

 Moreover, the trial court disregarded the portion of the court’s
 
 Foster
 
 opinion most pertinent in this inverse condemnation case:
 

 “The record shows repeated requests for permission to enter and accompanying denials of permission by the Government. The situation is similar to that faced by this court in
 
 Benenson v. United States,
 
 548 F.2d 939, 212 Ct.Cl. 375 (1977). While
 
 Benenson
 
 concerned overly extensive governmental regulation which resulted in a taking of the Willard Hotel in Washington, D.C., its principles are apt. In that case, plaintiffs were deprived of any commercially feasible use of their property by the vacillation of the Government which neither condemned the hotel nor allowed any development of that property. As then Chief Judge Cowen stated in his forceful opinion in
 
 Benenson,
 
 ‘[T]he Government’s interference with the owner’s use of his property may be so substantial and burdensome that a constitutional taking is implied.’
 
 Id.
 
 548 F.2d at 947, 212 Ct.Cl. at 388. The same type of situation is present here with the Government denying plaintiffs use of their mineral rights yet not condemning those property interests.”
 

 Similarly, the trial court dismissed
 
 Bourgeois, supra,
 
 and
 
 Yaist, supra,
 
 on grounds rendered irrelevant by the record as it presently exists in this case.
 

 (2) Good Faith Effort to Protect Property
 

 The trial court supplied its own interpretation of the government action here as merely a “good faith” effort to “protect what it deems to be its property.” It characterized the Corps of Engineers’ letters as merely the assertion of “a claim to its right
 
 *889
 
 ful ownership subject to judicial determination.” It summed up those letters as “at most” telling Yuba it would be accountable if it extracted government property.
 

 The difficulty lies in a total absence from the record of evidence supporting the determinations that the United States acted in good faith, that the United States at any time contemplated subjection of its claim to judicial determination, and that the one-sentence reference to accountability constituted the most Yuba was told. On the contrary, the evidence supplied by the statement to Yuba that dredging was “prohibited” (evidence disregarded by the trial court) would point in a direction of determinations distinct from those reached by the trial court. At the very least, the record reflects genuine issues of material fact relating to the prohibiting portion of the government action here. Those issues preclude summary judgment on the grounds stated.
 

 The notion that the United States was merely asserting a good faith claim subject to judicial determination appears to have led to erroneous reliance on
 
 DSI Corp., supra.
 
 In that ease, the United States itself brought a foreclosure action in federal court on its second mortgage. In that proceeding, it attacked as invalid a citizen’s first mortgage on the same property. As the Court of Claims made plain in
 
 DSI Corp.,
 
 it there held that assertion by the United States of a right in a judicial proceeding is not itself a taking. Here, of course, there was no evidence whatever that the United States ever did, or ever intended to, institute judicial action or in any manner to submit to judicial determination its presumed right to prohibit the exercise of Yuba’s mineral rights.
 
 DSI Corp.
 
 is on this record simply inapt.
 

 (3) Proprietary v. Sovereign Capacity
 

 Without support in the record other than its own interpretation of parts of the Corps of Engineers’ letters, the trial court determined that the United States here acted in a proprietary rather than in a sovereign capacity. Because the resolution of the “proprietary-sovereign” dichotomy is not in itself controlling in just compensation jurisprudence, the grant of summary judgment on that ground was here inappropriate. Whether the plaintiff has been denied use of the property as a result of a governmental taking amounting to inverse condemnation is a question of fact.
 
 Laney v. United States,
 
 661 F.2d 145, 228 Ct.Cl. 519 (1981).
 

 The nature of the government action at bar as merely proprietary is not supported by a mere reading of selected phrases in the Corps of Engineers’ letters. The trial court’s characterization of the role of the United States as that of a private person is flawed by its disregard of the express notice, “dredging is prohibited.” Private persons do not talk like that; governments do.
 

 Expanded and expansive government conducting a myriad of activities earlier conducted in the private sector may on occasion function like a private party. But the United States is not a private party. It imposes penalties, criminal and civil, the threat of which lurks behind government statements like those here involved, regardless of what the government may have intended. The United States calls upon unlimited resources. In a property conflict, it carries the ultimate weapon, the power of eminent domain. Whether in a property conflict the actions of the government may be equated with those normal to a private citizen is determinable only in light of all the facts.
 

 In whatever other context it may be useful, moreover, determination of whether the United States has acted in a proprietary or governmental-sovereign capacity is of little, if any, use in Fifth Amendment-just compensation analysis. The purpose and function of the Amendment being to secure citizens against governmental expropriation, and to guarantee just compensation for the property taken, what counts is not what government said it was doing, or what it later says its intent was, or whether it may have used the language of a proprietor. What counts is what the government
 
 did. Hughes
 
 v.
 
 Washington,
 
 389 U.S. 290,
 
 *890
 
 298, 88 S.Ct. 438, 443, 19 L.Ed.2d 530 (Stewart, J., concurring) (1967). What the government appears to have done here was to prevent Yuba from mining minerals for about six years.
 

 Though Yuba makes much of the determination that what the government did was based on an invalid claim, nothing of record other than its failure to seek judicial determination indicates that the United States had reason to doubt the validity of its claim, and, in any event, the period of taking, if taking there be, terminated when the United States acceded to restoration of Yuba’s rights, a date apparently coinciding with or close to its appeal withdrawal, i.e., on January 4,1982, and the consequent finality of the judicial determination of title. If the United States’ claim had been valid, Yuba would have had no property subject to taking and no. taking could therefore have occurred. Thus, the mere invalidity of the United States claim is not relevant in determining whether a taking took place in this case.
 

 It is apparently undisputed on this record and may be established at trial that the initiating, causal force in the present case was the United States, that the United States told Yuba it, the United States, prohibited Yuba from exercising dredging rights Yuba had exercised since 1905, that the United States did nothing to judicially test its asserted claim to those mineral rights, that the United States insisted during protracted negotiations that it would enforce its claimed rights, that a judicial test had to be sought and paid for by Yuba, and that Yuba suffered deprivation of its property rights as a result of the actions of the United States. In light of the present record, therefore, it was error to grant summary judgment to the United States.
 

 The Government’s Arguments
 

 The government’s brief before us is uncharacteristically unhelpful. In an effort to sustain the judgment on the grounds on which granted, the government states the issues as: (1) whether letters “expressing an opinion” that the United States owned the involved mineral interests constituted a taking absent invasion or physical restraint; (2) whether the United States can be held liable when a taking is not authorized by Congress; and (3) whether loss of business profits is compensable under the Fifth Amendment.
 

 Issue (1) is a characterization of the letters unsupported in, if not directly contrary to, the record. The government’s brief nowhere mentions the “enforced” and “prohibited” language of the letters that make them more than expressions of opinion. Issue (2) as presented assumes that compensation is payable only upon exercise of the power of eminent domain or upon specific congressional authorization. Issue (3) rises out of a footnote in the trial court’s opinion. That footnote relates to damages, is unsupported in the record, arid is premature.
 

 The government’s brief ignores a number of Yuba’s arguments on the ground that the trial court did not mention them, but devotes an entire section to absence of congressional authorization, an argument admittedly not mentioned by the trial court. It incorrectly states that the United States submitted its claim to the scrutiny of the court in “accordance with
 
 DSI Corp.”
 
 It asserts that the government acted only in a proprietary capacity and also that as sovereign the government is not responsible for its agents’ acts not authorized by Congress. In support of the latter assertion, the government’s brief quotes from the opinion in
 
 Hooe v. United States,
 
 218 U.S. 322, 31 S.Ct. 85, 54 L.Ed. 1055 (1910), but expresses no view on Yuba’s citations of more recent holdings which like the present case involved alleged inverse condemnations. Similarly, the government’s brief makes no response to Yuba’s assertions concerning the government’s reliance here on its action as that of a proprietor and its reliance in the district court on a statute of limitations (28 U.S.C. § 2409(f)) available only to the sovereign. Finally, the government’s argument on damages is devoid of reference to
 
 Kimball Laundry Co. v. United States,
 
 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949),
 
 *891
 
 cited by Yuba as a leading case adverse to the government’s position.
 

 The government’s assertion that no taking can be found where the Corps of Engineers of the United States prohibited Yuba’s exercise of its right to extract minerals, the Attorney General of the United States supported that action with an opinion, and the Secretary of the Army of the United States supported that action in refusing to approve a settlement, on the sole ground that Congress has not been shown to have authorized anything, is to say the least surprising. No basis is cited for what appears to be the novel proposition that all of those government officials were without authorization to assert what they believed were the rights of the United States, to announce an intent to enforce those rights, and to prohibit what they viewed as infringement of those rights. Nor has the government indicated that it has in any manner ordered such officials to seek Congressional authorization before taking such actions again. As the letters of record make plain, moreover, the United States initiated and continued its action here as part of its “Marysville project as
 
 authorized by PL 89-789”
 
 (emphasis added).
 

 On the present record, therefore, it appears that the government, acting as it must through its authorized appropriate officials, prohibited Yuba’s exercise of its right to dredge and to enjoy possession of the minerals thereby unearthed, and now resists payment of just compensation on the sole ground that it was careful to refrain from exercising its power of eminent domain, an act that would have unquestionably required it to pay the just compensation required by the Constitution. If upon the trial the record remains essentially unchanged, the scenario brings to mind the salutary view that, whatever the outcome, the United States wins when justice is done.
 

 As above indicated, grounds cited by the United States in support of its motion were disregarded by the trial court. On appeal, the United States disregards three of those grounds (Election of Remedies, No Standing in Placer Service Corporation, and
 
 Res Judicata),
 
 even though Yuba treated them extensively in its opening brief. In the interest of judicial economy, we note our agreement with the trial court, and apparently with the government, that in this case those issues are appropriately and eminently worthy of disregard.
 

 CONCLUSION
 

 The grant of summary judgment where a trial would be fruitless and the moving party is clearly entitled to judgment as a matter of law serves an exemplary role in the judicial process. Because the remedy can be harsh in its finality, however, its application must be accompanied by great care in respect of the entire record and the relevant law. The basic fact issue, whether there was or was not a taking, having been determined on less than the entirety of a complete record, the grant was in this case error. Accordingly, the order dismissing the complaint on the government’s motion must be vacated and the case remanded for trial.
 

 VACATED AND REMANDED.