**Simon H. RIFKIND and Harry Meresman, Executors of the Will of Charles H. Revson, deceased, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 739–81T.**

United States Claims Court.

May 30, 1984.

---

Bernard H. Greene, New York City, for plaintiffs. Jonathan J. Rikoon, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, of counsel.

W.C. Rapp, Washington, D.C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., and Theodore D. Peyser, Jr., Washington, D.C., for defendant.

**364**

## OPINION

NETTESHEIM, Judge.

Section 2001 of the Internal Revenue Code, 26 U.S.C. § 2001 (1970) (the "I.R. C."), imposes a tax upon the transfer of the taxable estate of a decedent who dies a citizen or resident of the United States. The value of the taxable estate is derived by subtracting from the value of the gross estate the exemptions and deductions allowed by I.R.C. §§ 2051–2057. Pre-death transfers by trust or otherwise of certain interests in property, including section 2038 powers to alter, amend, revoke, or terminate and section 2041 powers of appointment, could be swept into the gross estate by I.R.C. § 2035, which until recently, *see infra* note 5, imposed a rebuttable presumption that such transfers taking place within three years of death were made in contemplation of death.

Plaintiffs seek a refund of estate taxes in the amount of $3,255,661.17,[1] plus interest. This case, now before the court after argument on plaintiffs' motion for summary judgment and defendant's cross-motion for partial summary judgment, as respectively opposed, concerns the application of federal estate tax law to the estate of Charles H. Revson ("Revson" or "decedent"), founder of the Revlon cosmetics empire. The parties have stipulated to facts they deem material. The major issues are whether the assets in a trust are includible in decedent's gross estate and whether stock has been valued properly.

I. *The Includability of the Trust in the Gross Estate*

On November 13, 1961, Revson created the Charles H. Revson Charitable Trust No. 1 (the "Trust") primarily to reduce his income taxes for 1961. The Trust assets in 1961 consisted of 35,000 shares of Revlon common stock transferred in the form of voting trust certificates. The trustees of the Trust were plaintiff executors Rifkind and Meresman ("plaintiffs" or the "Trustees"). Under the terms of the Trust, the sole income beneficiary, as long as Revson lived, was the Charles H. Revson Foundation, Inc. (the "Foundation"), a charitable corporation previously organized in 1956. The Trustees had no discretion over Trust distributions; all income was payable to the Foundation during Revson's life. Upon Revson's death the Trust corpus was to be divided among his surviving children or their surviving children. In a Technical Advice Memorandum dated February 21, 1978, defendant took the position that the corpus of the Trust was worth $3,670,000 when Revson died.

Revson never held a position, as Trustee or otherwise, with the Trust. He was, however, an officer, member, and director of the Foundation from November 13, 1961, through his resignation from all positions on April 20, 1973. As a director, Revson had the power with two other directors to designate the recipients of the Foundation's grants which were restricted to charitable organizations.[2]

The IRS in 1972 issued Rev.Rul. 72–552, 1972 C.B. 525, holding in part that the value of *inter vivos* transfers to a charitable corporation was to be included in the estate of the donor under 26 U.S.C. § 2036 (1970), since, as an officer of the corporation, the decedent had the power to direct

---

1. By their second amended petition, plaintiffs increased this amount to $6,032,365.28, plus interest, reflecting a claimed setoff to any recovery on the offset defendant asserted in its first amended answer. As plaintiffs apparently recognized in oral argument, a setoff would not increase their claim for refund.

2. The Foundation's Certificate of Incorporation reads in pertinent part:
    The purposes for which it is to be formed are: To accept, receive, hold, invest, reinvest and administer gifts, legacies, bequests, devises, funds, benefits of trusts and property of any sort or nature, without limitation as to amount or value and to use, apply, expend, disburse, or donate the income or principal thereof for and to devote the same to, exclusively religious, charitable, scientific, testing for public safety, literary or educational purposes either directly or by contributions to other agencies, organizations or institutions organized for the same or similar purposes, no part of whose net earnings shall inure to the benefit of any private shareholder or individual . . . .

the disposition of his funds for charitable purposes. The estate tax implications of this ruling for the Trust concerned Revson's attorneys, who advised Revson that resignation from all of his positions with the Foundation in 1961 would help his estate avoid possible litigation over the inclusion of the Trust in his gross estate. On April 20, 1973, Revson resigned his positions with the Foundation. On August 24, 1975, he died. Defendant argues that the Trust is includible in the estate because until 1973 Revson retained a section 2036 interest in the Trust corpus (the right to select the recipients of the income), which is to be swept back into the estate under section 2035 as it was relinquished only in contemplation of death.

A. *The Includibility of the Trust Under I.R.C. § 2036(a)(2)*

In determining the tax liability of a decedent's estate, the court is to apply the statutes and regulations as they existed at the time of decedent's death. I.R.C. § 2036, entitled "Transfers with Retained Life Estate," as of August 24, 1975, provided as follows:[3]

(a) *General Rule.*—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—

(1) The possession or enjoyment of, or the right to the income from, the property, or

(2) The right, either alone or in conjunction with any person, to designate the person who shall possess or enjoy the property or the income therefrom.

Defendant contends that the Trust is includible within the gross estate under section 2036(a)(2). Its position is that the Trustees of the Trust had no discretion as to payment of the income from the Trust assets. All income was required to be paid to the Foundation, whereupon Revson, as a Director, had "the right in conjunction with ... [other directors] to designate the persons who" could enjoy or possess the income therefrom.

Plaintiffs mount a three-pronged assault upon this logic. First, they argue that because the Trust, over which decedent had no section 2036(a)(2) powers, was separate from the Foundation, over which decedent did have a section 2036(a)(2) power, the arrangement blocked the reach of that statute. Their second argument stems from the language of subsection (a) requiring that decedent make "a transfer under

---

3. Treas.Reg. § 20.2036–1 (1975), reads in pertinent part:

(a) *In general.* A decedent's gross estate includes under section 2036 the value of any interest in property transferred by the decedent after March 3, 1931, whether in trust or otherwise, except to the extent that the transfer was for an adequate and full consideration in money or money's worth (see § 20.2043–1), if the decedent retained or reserved (1) for his life, or (2) for any period not ascertainable without reference to his death (if the transfer was made after June 6, 1932), or (3) for any period which does not in fact end before his death:

(i) The use, possession, right to the income, or other enjoyment of the transferred property, or

(ii) The right, either alone or in conjunction with any other person or persons, to designate the person or persons who shall possess or enjoy the transferred property or its income ....

\* \* \* \* \* \*

[ (b) ](3) The phrase "right ... to designate the person or persons who shall possess or enjoy the transferred property or the income therefrom" includes a reserved power to designate the person or persons to receive the income from the transferred property, or to possess or enjoy nonincome-producing property, during the decedent's life or during any other period described in paragraph (a) of this section. With respect to such a power, it is immaterial (i) whether the power was exercisable alone or only in conjunction with another person or persons, whether or not having an adverse interest; (ii) in what capacity the power was exercisable by the decedent or by another person or persons in conjunction with the decedent; ...

which he has retained" some sort of life estate. Because the Foundation, over which decedent arguably had control, existed prior to the creation of the Trust, over which Revson had no control, the creation of the 1961 Trust was not a transfer *under which* he retained rights, because those rights predated the transfer. Plaintiffs' third argument is that decedent did not have the right, alone or with someone else, to designate the person who could enjoy the Trust income because the Foundation could make payments only to charitable organizations.

1. *Separability of the Trust and the Foundation Under Section 2036(a)(2)*

■ The Supreme Court has dealt with the problem of the veiled exercise of a section 2036(a)(2) power through two separate entities. In *United States v. Byrum*, 408 U.S. 125, 92 S.Ct. 2382, 33 L.Ed.2d 238 (1972), the decedent transferred controlling shares of three closely held corporations to an irrevocable trust, retaining the right to vote the shares, to disapprove transfer of the shares by the trustee, to approve investments, and to remove and replace the trustee. Relying on section 2036(a), the IRS determined that decedent's stock should be included in his gross estate.

The Government argued that because of Byrum's control over the directors of the corporations, he could increase, decrease, or stop payment of the dividends and thereby regulate the flow of income to the trust, deferring or shifting the beneficial enjoyment of the trust income between current beneficiaries and the remaindermen. 408 U.S. at 131–32, 92 S.Ct. at 2387–88. The power of a grantor-trustee to accumulate income in a trust rather than to disburse it is recognized as a power to designate the persons who enjoy the income from the transferred property. *Id.* at 132, 92 S.Ct. at 2388 (citing *United States v. O'Malley*, 383 U.S. 627, 86 S.Ct. 1123, 16 L.Ed.2d 145 (1966)).

The Court began its analysis by noting that it had never held the grantor's retained power of managing trust assets to require inclusion of the property in the settlor's gross estate. 408 U.S. at 132–33, 92 S.Ct. at 2388–89. In *Reinecke v. Northern Trust Co.*, 278 U.S. 339, 49 S.Ct. 123, 73 L.Ed. 410 (1929), the opposite principle was announced. The Court in *Byrum* distinguished *O'Malley*, because there decedent had "an ascertainable and legally enforceable power," whereas Byrum had no such right. 408 U.S. at 136–37, 92 S.Ct. at 2390–91. In the first place, the trustee, not Byrum, decided whether or not to pay out income to the beneficiaries. *Id.* at 137, 92 S.Ct. at 2391. Secondly, the majority stockholder had a fiduciary duty to the minority stockholders, with attendant vulnerability to derivative suits, *id.* at 141, 92 S.Ct. at 2393, as well as fiduciary duties to the corporation which restrained abuses of power. *Id.* at 137–38, 92 S.Ct. at 2390–91. Moreover, the vicissitudes of corporate fortunes destroyed any assurance that Byrum could control the flow of income from the corporations to the trust. *Id.* at 139–40, 92 S.Ct. at 2392.

*Byrum* does not support plaintiffs' position. The Court relied heavily on the fact that any power Byrum arguably had was not effective in determining the beneficiaries of the trust. The trustee in his sole discretion—and from assets other than and in addition to the shares in issue—had the right to make payments out of the trust. *Id.* at 143, 92 S.Ct. at 2394. In the present case, the flow of income and control between the entities was reversed. Revson had no rights over the payment of income from the Trust to the Foundation, but once the Foundation received the income, he had the power with others to designate who would receive it. Plaintiffs argue that the Court in *Byrum* relied on the separate identities of the corporation and the trust. This contention, however, exalts form over substance. The Court examined the entire transaction and determined that, under the facts, the decedent did not have the power to designate beneficial enjoyment of the trust income. *Id.* at 144, 92 S.Ct. at 2394. Revson had that power and was not constrained by any fiduciary duties or economic realities. The restriction of the Founda-

tion's largesse to charitable beneficiaries was not comparable to the fiduciary restrictions operative in *Byrum*. There, the decision was whether or not to use corporate capital for dividends—here, there were no limits upon the discretion whether or not to disburse, only upon the choice of current beneficiaries. Further, there was a direct limitation in *Byrum* upon the device which allocated income between current and remaindermen beneficiaries; there was no such limitation on the settlor's actions in this case.

### 2. Rights "Retained Under" the 1961 Transfer

■ Plaintiffs' second argument against the application of section 2036(a)(2) relies upon the fact that Revson's control over the Foundation's disbursements derived not from the transfer in 1961, but from his positions with the Foundation dating back to 1956. Again, plaintiffs' contention sacrifices substance for form. Neither of plaintiffs' cases supports their position. In *Byrum*, the Court explicitly noted that there was no reservation of a legal right "in the trust instrument *or otherwise*," 408 U.S. at 136, 92 S.Ct. at 2390 (emphasis added), thereby implying that the search for a reservation could extend beyond the trust instrument itself, as in the present case. The possibilities of circumvention, were plaintiffs' position on the law to be upheld, are obvious. Any rights retained under a transfer to a preexisting trust would escape section 2036, because the reservation would be under the preexisting trust, not the transfer.

In plaintiffs' other case, *Estate of Wyly v. Commissioner*, 610 F.2d 1282 (5th Cir. 1980), the court held that in a community property state the rights retained by law in an interspousal transfer were contingent on the recipient spouse's death and did not amount to rights retained under the transfer within the meaning of section 2036. The *Wyly* court recoiled from imposing in community property states a rule including in the gross estate property which was not included in common law states, 610 F.2d at 1295, holding that the continuing right of the transferor over the *res* had not arisen under the transfers. The court also held that no right had been retained within the meaning of section 2036. However, its holding that no interest had arisen or been retained "under the transfers" applied only to an interest which arose solely by operation of law. In this case both the Trust and Foundation were established by Revson's hand. To the extent that *Wyly* could be read to apply here, this court would respectfully disagree.

### 3. Restrictions of Beneficiaries of the Foundation to Charitable Entities

■ Plaintiffs contend that because the Foundation's grantees were limited to charitable entities, Revson had no section 2036(a)(2) right over the Trust income. As in *Byrum*, he had fiduciary responsibilities because the Foundation came under the supervision of the Attorney General of New York. Moreover, according to plaintiffs, the prohibition against any private individuals benefitting from the Foundation adds another thread to a web of restraints stricter than those found in *Byrum*.

This argument simply misreads the statute. Section 2036(a)(2) makes no distinction between a general or limited range of trust beneficiaries; its only concern is with the right "to designate the person." That there was not an unlimited universe of potential designees is immaterial. *Industrial Trust Co. v. Commissioner*, 165 F.2d 142, 146 (1st Cir.1947) (right to choose between only two beneficiaries is still a right to designate). Nor were the limitations on Revson's power over the Foundation as restrictive as those in *Byrum*. The Attorney General of New York would certainly not step in to prevent the Foundation from favoring one eligible charitable organization over another. In contrast, if Byrum had preferred one shareholder over another, or adopted a dividend policy detrimental to the minority shareholders, those shareholders would have had a right of action against Byrum for the breach of his corporate responsibilities. Plaintiffs' third effort to elude the reach of section 2036(a)(2) also fails.

B. *Includibility of a Section 2036(a)(2) Right Within Section 2035*

■ The decedent resigned all his positions with the Foundation on April 20, 1973, so that he had no power over the Foundation when he died. His death within three years, however, on August 24, 1975, raises a presumption under I.R.C. § 2035 that the transfer was made in contemplation of death and therefore that the corpus of the 1961 transfer should be included in Revson's gross estate.

The question thus arises whether his relinquished section 2036(a)(2) right came within the ambit of section 2035. In 1975 the latter read in pertinent part:

(a) *General Rule.*—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate consideration in money or moneys' worth), by trust or otherwise, in contemplation of his death.

(b) *Application of General Rule.*—If the decedent within a period of 3 years ending with the date of his death (except in the case of a bona fide sale for an adequate and full consideration of money or moneys' worth) transferred an interest in property, relinquished a power, or exercised or released a power of appoint-ment, such transfer, relinquishment, exercise or release shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section and sections 2038 and 2041 (relating to revocable transfers and powers of appointment); but no such transfer, relinquishment, exercise or release made before such 3 year period shall be treated as having been made in contemplation of death.

Plaintiffs first argue that subsection (b) expressly provides a presumption only for interests described in subsection (a) and sections 2038 and 2041 and that a section 2036(a)(2) right is not such a property interest. Plaintiffs offer authority for the proposition that if Congress specifically has identified certain powers relinquished in contemplation of death as includible in the gross estate, others cannot be included, even under section 2035(a). Plaintiffs concede, however, that retained income interests under section 2036(a)(1) are includible under section 2035(a). Defendant rejoins that under plaintiffs' position the only power, right, or interest in property not brought into the estate by section 2035 is one described in section 2036(a)(2). Plaintiffs offer no logical reason for excluding section 2036(a)(2) interests alone.[4]

Treas.Reg. § 20.2035–1(b) (1975) (in ef-

---

**4.** At oral argument counsel for plaintiffs attempted to answer defendant's question as to why Congress would apply section 2035 to a host of situations, yet refrain from applying it to section 2036(a)(2). First, plaintiffs argued that they were not required to explain why Congress acted as it did; they need only show what it did under the maxim that Congress in legislation can make choices without explaining itself. Secondly, the legislative history shows that Congress was concerned with situations other than that presented by Revson's estate. Apparently, the decisions in *May v. Heiner*, 281 U.S. 238, 50 S.Ct. 286, 74 L.Ed. 826 (1930); *Burnet v. Northern Trust Co.*, 283 U.S. 782, 51 S.Ct. 342, 75 L.Ed. 1412 (1931); and *McCormick v. Burnet*, 283 U.S. 784, 51 S.Ct. 343, 75 L.Ed. 1413 (1931), caused Congress to adopt what became section 2036(a) in order to avoid a revenue shortfall and payment of refunds. 74 Cong.Rec. 7,078 (1931). It is true that the situation excluded from taxation in these cases—a trust made by A,

income to A for A's life, remainder to others after death—is not the same as Revson's. Yet, the plain words of the statute cover Revson's "right to designate the persons who shall possess or enjoy the property or the income ...." There is no need to go beyond this plain language, *see, e.g., United States v. H. Rosenthal Co.*, 609 F.2d 999, 1001 (C.C.P.A.1979) (Markey, C.J.), nor is Congress required to provide examples of every possible factual situation its statutes embrace. Furthermore, the legislative history does lend support to defendant's position. As described to the House, the settlor in *McCormick* had the right to draw income whenever her own income fell below a certain level and also reserved the right to dispose of income from the trust, in excess of that needed to supplement her own income, "by ordering its payment to others." 74 Cong.Rec. 7,198. Revson had the same right except that no portion of the income went to himself—an irrelevant distinction.

fect since 1958),[5] provides in pertinent part:

*Application of other sections.* If a decedent transfers an interest in property or relinquishes a power in contemplation of death, the decedent's gross estate includes the property subject to the interest or power to the extent that it would be included under section 2036, 2037, or 2038 if the decedent had retained the interest or power until his death....

Plaintiffs deny that this regulation can reach section 2036(a)(2) powers, as opposed to section 2036(a)(1) powers. Regulations, they note, cannot expand the statutory language beyond its congressionally intended scope.

The parties dispute the significance of Congress' silence on the literal interpretation of Treas.Reg. § 20.2035-1(b). Defendant takes the position that silence is acquiescence. There is some support for its view. " 'Treasury regulations and interpretations long continued without substantial change, applying to unamended or substantially reenacted statutes, are deemed to have received Congressional approval and have the effect of law.' " *United States v. Correll,* 389 U.S. 299, 305-06, 88 S.Ct. 445, 449, 19 L.Ed.2d 537 (1967) (quoting *Helvering v. Winmill,* 305 U.S. 79, 83, 59 S.Ct. 45, 46, 83 L.Ed. 52 (1938)). Plaintiffs reply that nothing can be inferred from subsequent amendment of the statute because the only amendment to section 2035 since 1958 was one related to exceptions for real property located outside the United States. "Legislative silence is a poor beacon to follow in discerning the proper statutory route...." *Zuber v. Allen,* 396 U.S. 168, 185, 90 S.Ct. 314, 323, 24 L.Ed.2d 345 (1969). "Where ... there is no indication that a subsequent Congress has addressed itself to the particular problem, we are unpersuaded that silence is tantamount to

acquiescence, let alone ... approval...." 396 U.S. at 186 n. 21, 90 S.Ct. at 324 n. 21. "Congress neither knows nor can be expected to know about the administrative constructions of the statute, and its reenactment of the statute, therefore, indicates not even the slightest approval of the ... [regulation]." Brown, *Regulations, Reenactment, and the Revenue Acts,* 54 Harv. L.Rev. 377, 383 (1941) (criticizing the judicial cannon of approval by reenactment).

The court does not rely on Treasury regulation 20.2035-1(b) in reaching its decision.

The thrust of plaintiffs' argument regarding section 2035 is that the right to designate the person who shall enjoy property or income from property is not an interest in property. Plaintiffs would distinguish a section 2036(a)(2) power on the ground that all powers included within the contemplation of death statute enable the decedent either to benefit personally from the property or to control the disposition of the property, whereas a section 2036(a)(2) power relates only to disposition of the income for the benefit of someone other than decedent. That power, they argue, is too attenuated a right to be called a property interest.

Plaintiffs' distinction between subsections (1) and (2) is artificial. Subsection (a)(1) refers to the settlor's possession, enjoyment, or right to the income from property, whereas subsection (a)(2) relates to the power to designate someone else who might enjoy such benefits. The right to designate who shall enjoy property or the income therefrom is itself a form of enjoying such property or income, just as, under well-settled principles of tax law, the right to designate the recipient of income is a form of income. Because of the paucity of

**5.** The current code makes section 2035(a) generally inapplicable to those who become decedents after 1981. However, Congress refers specifically to interests described in sections 2036, 2037, and 2038 as within section 2035(a). Economic Recovery Tax Act of 1981, Pub.L. No. 97-34, § 424(a), 95 Stat. 172, 317. Today a decedent may make an unlimited number of outright transfers up to the moment preceding

his death with no estate tax consequences. Property subject to sections 2036, 2037, 2038, or 2042 is includible in the estate, as well as property which would have been included under those sections if the property had been retained until death. The court does not rely on this post-hoc expression of congressional intent as to the includibility of section 2036(a)(2) rights within section 2035.

judicial precedent regarding section 2036(a)(2)'s inclusion within section 2035, plaintiffs are able to argue that a distinction exists. The court, however, is loath to and will not make such an artificial distinction. The right to designate who will enjoy property or the income therefrom is a property interest. Section 2035 comprehends section 2036(a)(2).

C. *Whether Decedent's Resignation from His Positions with the Foundation Was in Contemplation of Death*

■ The Trust was created and funded after the IRS issued a private letter ruling confirming that over $5.4 million of nonrecurring extraordinary capital gain would be taxed to Revson in the 1961 tax year. Decedent's total 1961 contribution for income tax purposes of nearly $600,000 brought his contributions within one half of one percent of the statutory limit on deductibility. Revson was 55 years old in 1961 and in excellent health. The assets that he transferred to the Trust in 1961 represented approximately 1.5 percent of the value of his total assets. Revson paid gift tax on the transfer and made no further contributions to the Trust.

The parties are in general agreement as to the motivation and purposes of the 1961 transfer of voting Trust certificates to the Trust. Plaintiffs state that Revson's primary motive was to save current income taxes through a charitable deduction. Other motives in making the 1961 transfer were to provide for his children after Revson's death and to remove the property transferred from his gross estate for estate tax purposes. Plaintiffs term this third motivation secondary or ancillary, whereas defendant would place it on equal footing with the other two.

When he resigned from the Foundation, aged 67, Revson was still in excellent health. According to plaintiffs' submissions, on April 15, 1974, Revson was diagnosed as suffering from cancer of the pancreas. Decedent's physician reports in an unsworn statement that he considered the condition to be ultimately fatal, but did not

so inform Revson. On August 24, 1975, Revson died.

Because Revson relinquished a property interest within three years of his death, it is presumed under section 2035(b) that the transfer was made in contemplation of death, and it is plaintiff's burden to show that it was not. *Wickwire v. Reinecke,* 275 U.S. 101, 48 S.Ct. 43, 72 L.Ed. 184 (1945); *Peters v. United States,* 216 Ct.Cl. 134, 139, 572 F.2d 851, 854 (1978).

1. *Determination of Motivation as a Matter of Law*

Conceding that contemplation of death is a question of ultimate fact, plaintiffs argue that *Allen v. Trust Co.,* 326 U.S. 630, 66 S.Ct. 389, 90 L.Ed. 367 (1946), mandates that Revson's resignation from the Foundation be found not in contemplation of death as a matter of law. Decedent in *Allen* established spendthrift trusts in 1925 for each of his children and added to the trusts in 1934. The power to amend the trusts with consent of the trustee and beneficiary was retained. In 1937, after the Supreme Court's holding in *Helvering v. City Bank Farmers Trust Co.,* 296 U.S. 85, 56 S.Ct. 70, 80 L.Ed. 62 (1935), that the reservation of a power to amend brought the corpus of the trust into the settlor's estate even though the power could not be exercised by the settlor alone, decedent renounced his power to amend the trusts. When he took these actions, the settlor "did not entertain thoughts of death except the general expectation of death that all entertain." 326 U.S. at 633, 66 S.Ct. at 390. Decedent's death at age 82, within two years of renouncing the power, triggered the presumption that his actions had been in contemplation of death. *Id.* at 634, 66 S.Ct. at 391.

The Supreme Court in *Allen* held unanimously that the statutory presumption had been overcome. The initial purpose of establishing the trust was to meet the present necessities of the settlor's children—giving them property free of all claims, including taxes. The settlor's release of the power to amend in 1937 was made to accomplish his original purpose,

which he later discovered had not been achieved. 326 U.S. at 636, 66 S.Ct. at 392.

In plaintiffs' view the ultimate import of *Allen* is that "where a lifetime transfer not in contemplation of death is later perfected for estate tax purposes, after an intervening development in the law ... jeopardizes the exclusion the decedent thought he had achieved, the later perfection cannot be in contemplation of death, as a matter of law." Plfs' Br. filed May 23, 1983, at 32. However, plaintiffs' intimation that the Court so ruled as a matter of law is incorrect. The Court honored factual determinations made by the district court: "Those findings are sufficient to overcome the statutory presumption ...." 326 U.S. at 636, 66 S.Ct. at 392. Moreover, there is no evidence in the record concerning Revson's attitude toward death in 1961 or 1973, which the Supreme Court in *Allen* noted was a factor supporting a lifetime motive. *Allen* therefore does not support a precipitous resolution of the issues in the posture of summary judgment. *See Yuba Goldfields, Inc. v. United States,* 723 F.2d 884 (Fed.Cir.1983).

Plaintiffs and defendant, respectively, rely on *Denniston v. Commissioner,* 106 F.2d 925 (3d Cir.1939), and *Estate of McIntosh v. Commissioner,* 248 F.2d 181 (2d Cir.1957), *cert. denied,* 355 U.S. 923, 78 S.Ct. 366, 2 L.Ed.2d 353 (1958)—factually indistinguishable cases that directly conflict. In both, decedent retained a life estate in trust income with reserved power to bestow the corpus by testament, which power each relinquished within three years of death in order to avoid estate taxes. Plaintiffs' case takes the extreme position that a purpose to provide for children after death while avoiding estate taxation does not show contemplation of death in the absence of "fear of failing health or impending death." 106 F.2d at 928. This case is out of line with controlling authorities that require the court to distinguish

between life- and death-related motives for transfers. The court in *McIntosh* relied on findings below that the relinquishment of the power could not be "related to an earlier effort to make a disposition having a 'life intent,' for the earlier actions ... were all taken with the same purpose of avoiding [estate] taxes." 248 F.2d at 184. A determination whether Revson's 1973 action can be related back to an earlier disposition having a lifetime motive, as in *Allen,* or whether it cannot, as in *McIntosh,* must await the careful scrutiny of the circumstances of this case as brought out at trial.[6]

In *Allen* the conclusion that the later transfer was not in contemplation of death was based on imputation of the first transfer's life motive to the later action. Because, according to plaintiffs, the purpose of the 1961 transfer is to be imputed to the 1973 relinquishment, plaintiffs endeavor to establish that the 1961 transfer was not made in contemplation of death.

Plaintiffs go so far as to argue that a motive to provide for children and descendants is a lifetime motive in and of itself. Plfs' Br. filed May 23, 1983, at 35 (citing *Allen,* 326 U.S. at 636, 66 S.Ct. at 392). However, although in *Allen* the lifetime and post-death beneficiaries were the natural objects of a testamentary disposition, *i.e.,* decedent's children, the provision for lifetime enjoyment of income and the children's spendthrift history overcame an implication that the scheme was designed to be a testamentary disposition. In contrast, Revson's children enjoyed nothing from the Trust until he died. Perhaps a desire to provide the Foundation with income "free from all claims" during his life is a life-related motive, but certainly it is not the same as the motive associated with the post-death disposition to his heirs. Two objects of decedent's beneficence existed here. In *Allen* they were the same both before and after death.

---

**6.** Satisfied with plaintiffs' formulation of Revson's motives for the 1973 relinquishment, defendant urges that summary judgment be entered in its favor on the issue of contemplation of death. The cases discussed on which defendant chiefly relies turn on findings of fact to which the reviewing courts deferred. The record in this case on Revson's motives is not such that *McIntosh* or *Allen* could control as a matter of law.

Defendant's principal distinction between *Allen* and this case is that in the former the decedent at the time of the first transfer intended to make a complete gift, whereas Revson originally intended and accomplished the objective of retaining the right to designate the income beneficiary. Thus, according to defendant, Revson's relinquishment did not accomplish a prior nontestamentary objective. In *Allen*, however, decedent retained a power, jointly, to amend the trust which was analogous to the powers retained by Revson in the present case.

In addition, although defendant does not quarrel with Revson's primary motive, as plaintiffs characterize it, of reducing income taxes (which has been held to be a lifetime motive, *see Becker v. St. Louis Union Trust Co.*, 296 U.S. 48, 52, 56 S.Ct. 78, 80, 80 L.Ed. 35 (1935)), defendant observes that by 1973 that admittedly life-related purpose had been accomplished and that Revson's 1973 relinquishment did not serve to complete the objective of the 1961 transaction.

2. *Factors to be Considered in Trial on Contemplation of Death*

At the date of Revson's death Treas.Reg. § 2035–1(c) (1975), addressed the factual determination of contemplation of death:

(c) *Definition.* The phrase "in contemplation of death", as used in this section, does not have reference to that general expectation of death such as all persons entertain. On the other hand, its meaning is not restricted to an apprehension that death is imminent or near. A transfer "in contemplation of death" is a disposition of property prompted by the thought of death (although it need not be solely so prompted). A transfer is prompted by the thought of death if (1) made with the purpose of avoiding death taxes, (2) made as a substitute for a testamentary disposition of the property, or (3) made for any other motive associated with death. The bodily and mental condition of the decedent and all other attendant facts and circumstances are to be scrutinized in order to determine whether or not such thought prompted the disposition.

The regulation fairly tracks the statute as it has been interpreted by the judiciary. The touchstone is *United States v. Wells*, 283 U.S. 102, 51 S.Ct. 446, 75 L.Ed. 867 (1931). "Transfers in contemplation of death" are those in which the thought of death is the impelling motive. 283 U.S. at 118. Necessarily, this emphasis permits motives other than death to exist, but the question of fact in each case is whether contemplation of death was the "dominant, controlling or impelling motive." *Allen*, 326 U.S. at 636, 66 S.Ct. at 392. "The question, necessarily, is as to the state of mind of the donor," and the test is always motive. *United States v. Wells*, 283 U.S. at 117, 51 S.Ct. at 451. The first and second criteria of the regulation actually read together because transfers are within the section if they are "substitutes for testamentary disposition" made for the purpose of "evasion of the estate tax." *Id.* at 117, 51 S.Ct. at 451. Plaintiffs must overcome the statutory presumption with affirmative evidence of motive associated with life. *American Fletcher National Bank & Trust Co. v. United States*, 222 Ct.Cl. 117, 126, 611 F.2d 360, 365 (1979).

It is possible to construct a laundry list of life motives, but such a list must be applied with caution because "illustrations are useful but not exhaustive." *United States v. Wells*, 283 U.S. at 118, 51 S.Ct. at 452.

Among the circumstances to be considered and weighed in determining what was the dominant motive of the decedent in making *inter vivos* transfers of his property, are the following: (a) The age of the decedent at the time the transfers were made; (b) the decedent's health, as he knew it, at or before the time of the transfers; (c) the interval between the transfers and the decedent's death; (d) the amount of the property transferred in proportion to the amount of property retained; (e) the nature and disposition of the decedent, e.g., whether cheerful or gloomy, sanguine or morbid, optimistic or pessimistic; (f) the existence of a gen-

eral testamentary scheme of which the transfers were a part; (g) the relationship of the donee or donees to the decedent, i.e., whether they were the natural objects of his bounty; (h) the existence of a long established gift-making policy on the part of decedent; (i) the existence of a desire on the part of the decedent to escape the burden of managing property by transferring the property to others; (j) the existence of a desire on the part of the decedent to vicariously enjoy the enjoyment by the donees of the property transferred; and (k) the existence of the desire by the decedent of avoiding estate taxes by means of making *inter vivos* transfers of property.

*Estate of Johnson*, 10 T.C. 680, 688 (1948) (cited with approval in *Hoover v. United States*, 148 Ct.Cl. 645, 651, 180 F.Supp. 601, 605 (1960)). Among the factors which might be added to this list would be the life-related desire to see how devisees handle property during the decedent's lifetime, so that he can better prepare his at-death disposition. *See United States v. Wells*, 283 U.S. at 105, 51 S.Ct. at 447.

In plaintiffs' favor are the facts that Revson in both 1961 and 1973 was fairly young and in good health and that the property transferred was a small portion of his fortune. Working against plaintiffs is the fact that the natural objects of decedent's bounty, his offspring, only received the corpus after Revson's death, as if by testamentary disposition. No evidence has been presented that, for example, Revson wished to rid himself of management of the property (indeed, as a Foundation officer and director he retained significant management power), or that the transfer was part of a long pattern of gift-giving, or that he derived vicarious enjoyment from the transfer.

II. *Apportionment of Interest Expense on Pre-death Income Tax Liability Between Estate Principal and Income*

■ The state probate proceeding (Surrogate's Court, Westchester County, New York) on March 27, 1984, approved plaintiffs' intermediate accounting, including crediting the estate residuary with over $17,000,000 of net gain realized on decedent's assets. State taxes have been paid from the appreciated noncharitable residuary.

Under I.R.C. § 2033, the gross estate includes all property of the decedent, to the extent of his interest therein, at death. The value both of the property included in the gross estate and of the gross estate is determined as of the date of decedent's death or alternate valuation date established by the Code. I.R.C. §§ 2031(a), 2032. One allowable deduction is for the amount of all charitable bequests. I.R.C. § 2055(a)(2). Revson's will provides that estate taxes shall be paid out of the noncharitable residuary, the net effect of which is to protect the charitable bequests from diminution and thereby preserve the maximum charitable deduction and minimize federal estate taxes. As of the date the stipulation of facts was filed, March 24, 1983, plaintiffs had paid $214,472.04 in interest for income tax liabilities that predated Revson's death. The parties agreed that this amount is deductible from the gross estate as an administrative expense.[7]

The question is whether the expense is to be charged to the principal of the estate as of the date of death or to estate income. If charged to the principal, the charitable bequest could be subject to reduction.

Understandably desiring to retain as large a charitable deduction as possible, plaintiffs rely on New York law for the proposition that administration expenses, and, in particular, interest accruing after death on pre-death debts are chargeable to income, not principal. N.Y.Est.Powers & Trusts Law § 11–2.1(1)(1)(A) (McKinney 1967); *In re Cochran's Estate*, 176 Misc. 809, 29 N.Y.S.2d 249 (Sur.Ct.N.Y.Co.1941).

According to the parties, the Federal Circuit and the former United States Court of

7. The court indicated at oral argument that plaintiffs would prevail on this issue. In so doing, the court failed to appreciate the inconsistency of such a ruling with the cases hereafter discussed.

Claims have not spoken to the issue whether a state probate court's determination to allow a deduction for an expense of administration in a decedent's estate is conclusive for purposes of federal estate tax deduction. *Compare Estate of Park v. Commissioner*, 475 F.2d 673, 676 (6th Cir.1973), *and Ballance v. United States*, 347 F.2d 419, 423 (7th Cir.1965) (recognizing presumption), *with Marcus v. DeWitt*, 704 F.2d 1227, 1229–30 (11th Cir.1983) (rejecting presumption). However, the precise question presented is not the allowability of an item as an expense of administration, but the deference to be accorded state court directives on accounting. Insofar as the New York probate court allows an expense of administration to be paid out of post-mortem income, the accounting practice is at fatal variance with the entrenched principle of federal estate tax law that a decedent's estate must be valued at date of death, or alternative valuation date, for purposes of deducting later-incurred administration expenses. *Alston v. United States*, 349 F.2d 87, 89 (5th Cir.1965); *Waldrop v. United States*, 133 Ct.Cl. 902, 907, 137 F.Supp. 753, 755 (1956). Accordingly, post-mortem income cannot increase the non-charitable residuary estate. *First National Bank v. United States*, 490 F.2d 1054, 1056 (8th Cir.1974). Although New York law countenances payment of this expense of administration from post-mortem income, defendant's motion for partial summary judgment shall be granted on this item, which shall be paid from estate principal.[8]

**8.** The court does not reach the issue whether post-death appreciation can increase the value of the non-charitable residuary, because the parties believe that any deficiency can be paid without looking to appreciated assets.

**9.** Defendant has the right to reaudit a return and assert an offset whenever repayment is claimed. *Lewis v. Reynolds*, 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293 (1932); *Dysart v. United States*, 169 Ct.Cl. 276, 340 F.2d 624 (1965). Although an offset may be claimed during the course of litigation, as was done here, defendant cannot resist summary judgment on the offset merely by arguing that it has the right to assert and prove amounts due the IRS that should be deducted from any refund. *See infra* note 14.

### III. *Valuation of Stock in Decedent's Gross Estate*

In its first amended answer, defendant asserted the right to offset[9] any recovery either (1) by the amount that the valuation under I.R.C. § 2031 of 1,342,401 shares[10] of restricted Revlon stock in the estate took into account anticipated costs (including underwriting costs) of a possible secondary public distribution of the stock, or (2) by the amount of secondary distribution expenses actually incurred in the sale of the stock ($1,574,684.31) and deducted under I.R.C. § 2053(a)[11] as administration expenses of the estate. Defendant argues that the combined effect of discounting anticipated secondary distribution costs in the valuation of the stock and of deducting the actual costs incurred in the sale is a double deduction for the same expenses. On brief defendant does not challenge the deduction, but contests the propriety of a discount for anticipated costs of sale.

The right to take such a "double deduction" has never been squarely presented before any court, although its potential existence has been recognized and criticized. 32 Vand.L.Rev. 1003 (1979).

Plaintiffs cite *Estate of Joslyn v. Commissioner*, 500 F.2d 382 (9th Cir.1974) ("*Joslyn I*"); *Estate of Joslyn v. Commissioner*, 566 F.2d 677 (9th Cir.1977) ("*Joslyn II*"); and *Estate of Jenner v. Commissioner*, 577 F.2d 1100 (7th Cir.1978), in support of their right to take the deduction. Although plaintiffs in *Joslyn I* and *II*

**10.** This figure excludes the 53,554 shares in the Trust.

**11.** Section 2053 reads in pertinent part:
(a) *General Rule.*—For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estates such amounts—

\*   \*   \*   \*   \*   \*

(2) for administration expenses,

\*   \*   \*   \*   \*   \*

as are allowable by the laws of the jurisdiction, whether within or without the United States, under which the estate is being administered.

achieved the "double deduction," the Ninth Circuit never reached the issue whether valuation of shares properly took account of anticipated costs of their sale. *Joslyn I*, 500 F.2d at 383. The court merely held that the combination of a discount for such costs (which the Tax Court had allowed, *Estate of Joslyn*, 57 T.C. 722 (1972)), and a deduction for costs actually incurred did not constitute a double deduction (as the Tax Court ruled). 500 F.2d at 384.[12] On remand to determine the deductibility of secondary distribution expenses under section 2053, the Tax Court in *Joslyn II* held that the incidental expenses of sale were deductible, but that the underwriters' commissions were not because the underwriting transaction was properly viewed as a sale to the underwriter as a dealer. 63 T.C. 478, 483–85 (1975). The Ninth Circuit again reversed, holding that the underwriter was a mere conduit for the sale of stock. The Seventh Circuit in *Jenner* agreed with this "conduit" theory of the underwriting transaction, 577 F.2d at 1104–05, and also allowed the deduction, not being confronted with a valuation issue.

Plaintiffs cite *Commissioner v. Stewart's Estate*, 153 F.2d 17 (3d Cir.1946), *Havemeyer v. United States*, 103 Ct.Cl. 564, 59 F.Supp. 537 (1945), and *Campbell v. United States*, 228 Ct.Cl. 661, 661 F.2d 209 (1981), in support of the proposition that anticipated underwriting costs may be discounted in valuing stock.[13] In none of these cases was a court confronted with the possibility of a deduction for the same costs. The last-cited case reveals a conceptual inconsistency between the "conduit" theory on which the deduction for underwriting expenses depends and the rationale of those cases which discount secondary

distribution expenses in valuing restricted stock. Instead of hypothesizing an underwritten public sale by the owner in valuing the stock, the court in *Campbell* considered a hypothetical sale to a "sophisticated investor" to whom restricted stock may be sold without incurring registration expenses (the parties having suggested this method of valuation). The court reasoned that the price that a "sophisticated investor" would pay would be affected by the necessity of the buyer's incurring underwriting and registration expenses in reselling the stock. The value of the stock under the *Campbell* approach thus equates to the proceeds of an underwritten sale, but in the *Campbell* hypothetical, entitlement to the deduction passes to the "sophisticated investor." The absurd result that obtains in an underwritten sale by the owner, as in *Joslyn* and the case at bar, therefore does not arise.

Fortunately the court is not required to deal with the problem of the pernicious interaction of *Joslyn* and the valuation principles of *Havemeyer* and *Campbell*. The seven percent discount in the valuation of the stock which the commissioner allowed plaintiffs was for "blockage and non-registration," but defendant offers no evidence that the words "blockage and non-registration" as used in the deficiency notice allowing the discount were intended to cover the anticipated costs of sale whose consideration defendant protests.

The term "blockage," although loosely applied to many factors which reduce the value of a large block of stock (such as costs of underwriting and registration necessary for the sale), properly refers to the depressive effect on price of selling a large block of stock at once. Defendant con-

---

**12.** The court's real concern seemed to be with the fact that the Commissioner had adjusted the original valuation of the stock in the light of the subsequent sale, so as to reflect the sales costs actually incurred instead of the prior estimate of them. The court incomprehensibly concluded that the Commissioner's revaluation had deprived plaintiffs of a deduction. *Joslyn I*, 500 F.2d at 386. In *Joslyn II* the court further reasoned that, but for the revaluation, the deduction would not have duplicated the discount, as

if the Commissioner's revaluation, which drew attention to the problematic existence of what in effect was a double deduction, had created the problem. 566 F.2d at 678.

**13.** Rev.Rul. 83–30, 1983–1 C.B. 224, held that such costs may not be discounted in valuing stock under section 2031, but that actual costs may be deducted under section 2053. That is defendant's position in this litigation.

cedes the validity of an allowance for the latter factor. *See* Treas.Reg. § 20.2031–2(e) (1975). "Non-registration" includes the effect on value of necessary delays and attendant risks in selling restricted stock—a factor whose consideration defendant also does not challenge.

Because defendant's claim of offset is unsupported as required in RUSCC 56(c), (e), it cannot survive plaintiffs' motion for summary judgment. Defendant has failed to show the existence of a triable factual issue. *See Union Carbide Corp. v. American Can Co.*, 724 F.2d 1567, 1571 (Fed.Cir. 1984).[14] The court therefore does not reach the issue of plaintiffs' claimed setoff to any offset consisting of a 15 percent blockage and a seven percent non-registration discount.[15]

## CONCLUSION

Based on the foregoing, plaintiffs' motion for summary judgment is granted with respect to defendant's offset and is otherwise denied. Defendant shall not recover on its offset. Defendant's motion for partial summary judgment is granted with respect to the payment from estate principal of interest on pre-death income tax liabilities, and decision is reserved with respect to payment of estate taxes and interest from appreciated estate principal. Insofar as defendant moved for judgment on inclusion of the trust in decedent's estate by contemplation of death, defendant's motion is denied. The foregoing moots plaintiff's claim for a setoff.[16]

IT IS SO ORDERED.

---

**14.** Defendant offered no affidavits or documentary evidence to support its assertion that the seven percent discount allowed on audit represented in toto or otherwise costs of sale.

**15.** In their original return, plaintiffs claimed a combined 20 percent discount.

**16.** All arguments not specifically addressed have been considered carefully and rejected.