# United States Court of Appeals for the Federal Circuit

---

**DIMARE FRESH, INC., DIMARE RUSKIN, INC., DIMARE JOHNS ISLAND, INC., BUTLER FARMS, INC., CIRCLE C PRODUCE, LLC, FLOWERS FARMS, LLC, GREGORY ENTERPRISES, LLC, HIGH HOPE FARMS, LLC, HOPKINS FARMS, LLC, FRED JACKSON, DBA JACKSON FARMS, DAN JONES, JUNIPER TOMATO GROWERS, INC., JWM FARMS, LLC, MOBLEY GREENHOUSE INVESTMENTS, LLC, DALE MURRAY, GREG MURRAY, DBA MURRAY FARMS, PATTERSON FARM, INC., QUALITY PRODUCE, LLC, SK ENTERPRISES OF NORTH FLORIDA, INC., TOWNSEND BROTHERS FARMS, INC., TWO FEATHERS FARMS, INC., GARGIULO, INC., DMB PACKING CORP., ARTESIAN FARMS INCORPORATED, KUZZENS, INC., FARM OP, INC., WEST COAST TOMATO, LLC, MICHAEL BOREK FARMS, LLC, EAST COAST BROKER'S AND PACKERS, INC., A FLORIDA CORPORATION, C/O GERARD A. MCHALE, JR. AS TRUSTEE, DIEHL AND LEE FARMS, FRANK DIEHL, DBA FRANK DIEHL FARMS, ORA DIEHL,**
*Plaintiffs-Appellants*

v.

**UNITED STATES,**
*Defendant-Appellee*

---

2015-5006

---

Appeal from the United States Court of Federal Claims in No. 1:13-cv-00519-LJB, Senior Judge Lynn J. Bush.

————————————

Decided:  October 28, 2015

————————————

M. STEPHEN TURNER, Broad & Cassel, Tallahassee, FL, argued for plaintiffs-appellants.  Also represented by DAVID K. MILLER.

ERIC LAUFGRABEN, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee.  Also represented by BENJAMIN C. MIZER, ROBERT E. KIRSCHMAN, JR., FRANKLIN E. WHITE, JR.; DARETIA HAWKINS, Office of the General Counsel, United States Department of Health and Human Services, Washington, DC.

WILLIAM S. BILENKY, MansonBolves, P.A., Tampa, FL, for amici curiae The Florida Tomato Exchange, The Florida Fruit and Vegetable Association.

BAYLEN LINNEKIN, North Bethesda, MD, for amici curiae Keep Food Legal Foundation, Baylen Linnekin.

————————————

Before WALLACH, BRYSON, and HUGHES, *Circuit Judges.*

WALLACH, *Circuit Judge.*

Plaintiffs-Appellants ("Tomato Producers" or "Appellants") appeal the decision of the United States Court of Federal Claims ("Claims Court") dismissing their Amended Complaint pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC").  The

Claims Court dismissed the Amended Complaint on the ground that press releases issued by the Food and Drug Administration ("FDA" or "Government"), which warned consumers of a possible link between Appellants' tomatoes and an outbreak of *Salmonella* Saintpaul ("salmonella"), did not effect a regulatory taking. *See Dimare Fresh, Inc. v. United States*, 118 Fed. Cl. 455 (2014). For the reasons set forth below, we affirm.

## I. BACKGROUND

### A. FDA Press Releases

Between April 23 and June 1, 2008, there were fifty-seven reported cases of salmonellosis, an infection caused by the salmonella bacteria. Subsequently, the FDA, federal and state agencies, and food industry trade associations began an investigation to determine the source of the contamination. On June 3, 2008, the FDA issued a press release alerting consumers that the salmonella outbreak "appears to be linked" to the consumption of "raw red plum, red Roma, or round red tomatoes."[1] J.A.

---

[1] The warning stated in relevant part:

The [FDA] is alerting consumers in New Mexico and Texas that a salmonellosis outbreak appears to be linked to consumption of certain types of raw red tomatoes and products containing raw red tomatoes. . . .

The specific type and source of tomatoes are under investigation. However, preliminary data suggest that raw red plum, red Roma, or round red tomatoes are the cause. At this time, consumers in New Mexico and Texas should limit their tomato consumption to tomatoes that have not been implicated in the outbreak.

J.A. 34.

34. In that press release, the FDA also stated that "the source of the contaminated tomatoes may be limited to a single grower or packer or tomatoes from a specific geographic area" and that it was working "diligently . . . to quickly determine the source and type of the contaminated tomatoes." J.A. 34.

On June 7, 2008, the FDA released a second press release, informing the public that during the course of its investigation, it used "traceback[2] and other distribution pattern information" to identify specific geographic sources where tomatoes were safe to consume.[3] (footnote added). J.A. 35.

------

[2]    According to the FDA:

A traceback investigation is the method used to determine and document the distribution and production chain, and the source(s) of a product that has been implicated in a foodborne illness investigation.

*Guide to Traceback of Fresh Fruits and Vegetables Implicated in Epidemological Investigations,* FDA, http://www.fda.gov/ICECI/Inspections/InspectionGuides/ucm109510.htm (last visited Aug. 13, 2015).

[3]    The warning stated in relevant part:

On June 5, using traceback and other distribution pattern information, FDA published a list of states, territories, and countries where tomatoes are grown and harvested which have not been associated with this outbreak. This updated list includes: Arkansas, California, Georgia, Hawaii, North Carolina, South Carolina, Tennessee, Texas, Belgium, Canada, Dominican Republic, Guatemala, Israel, Netherlands, and Puerto Rico. . . .

On June 13, 2008, the FDA conducted a media briefing through its then–Associate Commissioner for Foods, Dr. David Acheson. Dr. Acheson stated the FDA suspected the contaminated tomatoes had been shipped from Florida or Mexico, and red plum, red Roma, and red round tomatoes were "incriminated with the outbreak." J.A. 40. Dr. Acheson, however, emphasized that the FDA had only issued a warning to consumers, and had not requested that any producers voluntarily recall tomatoes because the FDA had not "identified the particular source" of the salmonella outbreak. J.A. 48. Dr. Acheson also stated the FDA was still in the process of conducting an "ongoing investigation," and therefore the information gathered thus far was to remain "confidential." J.A. 42.

On July 17, 2008, the FDA issued a third press release announcing that "fresh tomatoes now available in the domestic market are not associated with the current outbreak." J.A. 62. "As a result, the agency [] remov[ed] its June 7 warning against eating certain types of red raw tomatoes." J.A. 62. Although the link between the salmonella outbreak and the Appellants' tomatoes was eventually disproved, the Tomato Producers allege that all or almost all of the value of the perishable tomatoes was destroyed due to a decrease in market demand for the Appellants' tomatoes. Appellants' Br. 19.

### B. The Tomato Producers' Amended Complaint

---

FDA recommends that retailers, restaurateurs, and food service operators not offer for sale and service raw red Roma, raw red plum, and raw red round tomatoes unless they are from the sources listed above. Cherry tomatoes, grape tomatoes, and tomatoes sold with vine still attached, may continue to be offered from any source.

J.A. 35.

The Tomato Producers are "growers, packers, and shippers of tomatoes in Florida and South Georgia." *Dimare*, 118 Fed. Cl. at 456 (internal quotation and citation marks). The Tomato Producers initially filed this suit as a putative class action on July 29, 2013. Supplemental Appendix 1.[4] Upon the Government's motion to dismiss the Complaint, the Tomato Producers filed an Amended Complaint on April 16, 2014, electing to remove the class allegations and name additional parties to the suit.

In the Amended Complaint, the Tomato Producers allege the June 3 and June 7, 2008 FDA press releases were harmful to their spring 2008 sales and that "[t]here was no practical or legal opportunity to contest, controvert or prevent the effect of the warnings." J.A. 31. The Tomato Producers also allege they "had [a] reasonable investment backed expectation to realize the market value of their tomatoes, but as a result of [the] FDA's regulatory warnings, all economic value was lost due to the collapse of the market for their tomatoes." J.A. 31. Finally, the Tomato Producers assert that the "only value of the tomatoes was prompt sale in bulk" and they "had a property right in their healthy tomatoes, specifically the right to market and sell them as healthy food." J.A. 31. As a result, the Tomato Producers claim that their "property right was effectively rendered valueless by the FDA's actions." J.A. 31.

Although the Tomato Producers acknowledged they were not mandated to quarantine their crops or prohibited from exercising their right to market or sell the tomatoes, they nonetheless allege that because they "had no practical alternative to preserve their tomatoes," J.A. 31,

---

[4]    Pursuant to Federal Circuit Rule 30(f), the Government attached a supplemental appendix to its brief. Appellee's Br. 5 n.3.

the FDA press releases "had the same burdensome effect as quarantining or prohibiting sale of [their] tomato crop." J.A. 30. Accordingly, the Tomato Producers allege that due to its practical effect on the market demand for tomatoes, the FDA's issuance of the press releases must be recognized as a "regulatory taking of the [Tomato Producers'] perishable tomatoes." J.A. 32.

## C. Procedural Posture and Jurisdiction

On May 5, 2014, the Government moved to dismiss the Tomato Producers' Amended Complaint pursuant to RCFC 12(b)(6) for failure to state a claim upon which relief can be granted. On September 18, 2014, the Claims Court granted the Government's motion and entered a judgment dismissing the Amended Complaint. On October 9, 2014, the Tomato Producers filed a timely notice of appeal. This court has jurisdiction under 28 U.S.C. § 1295(a)(3) (2012).

## I. DISCUSSION

### A. The General Principle Articulated by the Claims Court Is Not Supported by Our Takings Jurisprudence

Whether the Claims Court properly dismissed a "complaint for failure to state a claim upon which relief could be granted is an issue of law which we review de novo." *Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009) (citation omitted). To avoid dismissal for failure to state a claim, a complaint must allege facts "plausibly suggesting (not merely consistent with)" a showing of entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007); *see also Cambridge*, 558 F.3d at 1335. At this point in the proceedings, we accept the Tomato Producers' well-pleaded factual allegations as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although we primarily consider the allegations in a complaint, we are "not limited to the four corners of the complaint." 5B Charles Alan Wright & Arthur R. Miller,

*Federal Practice and Procedure* § 1357 (3d ed. 2004).  We may also look to "matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record." *Id.*

The Claims Court dismissed the Tomato Producers' Amended Complaint because it concluded their "regulatory takings claims are not plausible."  *Dimare*, 118 Fed. Cl. at 459 (capitalization modified).  In rendering this decision, the Claims Court specifically identified three of its cases from which it discerned the general principle that "[a] regulatory takings claim is not plausible and cannot proceed when the government action at issue has no legal effect on the plaintiff's property interest."  *Id.* at 460 (citing *A-1 Cigarette Vending, Inc. v. United States*, 49 Fed. Cl. 345 (2001), *aff'd sub nom. Brubaker Amusement Co. v. United States*, 304 F.3d 1349 (Fed. Cir. 2002); *Flowers Mill Assocs. v. United States*, 23 Cl. Ct. 182 (1991); *NBH Land Co. v. United States*, 576 F.2d 317 (Ct. Cl. 1978)).  The bright-line rule articulated by the Claims Court does not reflect applicable precedent.

The Takings Clause of the Fifth Amendment guarantees just compensation when private property is "taken" for public use.  U.S. Const. amend. V.  "It protects 'private property' without any distinction between different types." *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2426 (2015).  The "classic taking [is one] in which the government directly appropriates private property for its own use." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 324 (2002) (brackets and internal quotation marks omitted).  The Tomato Producers do not allege, and their Amended Complaint does not raise an allegation of, a "direct government appropriation or physical invasion of [their] private property." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005); *see also, e.g., United States v. Pewee Coal Co.*, 341 U.S. 114 (1951) (government seizure and operation of private coal mine); *United States v. Gen. Motors Corp.*, 323 U.S. 373 (1945)

(government occupation of private warehouse). Therefore, the Tomato Producers' Amended Complaint could only be read to support a regulatory takings claim.

Before the Supreme Court's decision in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922), "the Takings Clause was understood to provide protection only against a direct appropriation of property—personal or real. *Pennsylvania Coal* expanded the protection of the Takings Clause, holding that compensation was also required for a 'regulatory taking'—a restriction on the use of property that went 'too far.'" *Horne*, 135 S. Ct. at 2427 (citing *Pa. Coal*, 260 U.S. at 415).

The Supreme Court has treated certain regulatory actions as "categorical" takings. A categorical taking occurs when regulations "compel the property owner to suffer a physical invasion of his property" or prohibit "all economically beneficial or productive use." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992) (internal quotation marks omitted). However, beyond those categories, the Supreme Court has not "develop[ed] any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). Instead, it has relied on "ad hoc, factual inquiries into the circumstances of each particular case." *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 224 (1986) (citations omitted).

In engaging in these ad hoc, factual inquires, the Supreme Court has identified several factors bearing particular significance. In *Penn Central*, the Supreme Court considered three factors: (1) "[t]he economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the government

action." *Penn Cent. Transp. Co.*, 438 U.S. at 124; *accord Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984); *PruneYard Shopping Ctr. v. Robbins*, 447 U.S. 74, 82–83 (1980).

The general principle proffered by the Claims Court does not accord with Supreme Court precedent. The Supreme Court's "Takings Clause jurisprudence has generally eschewed 'magic formula[s]' and has 'recognized *few invariable rules.*'" *Horne*, 135 S. Ct. at 2437 (Sotomayor, J., dissenting) (emphasis added) (quoting *Ark. Game & Fish Comm'n v. United States*, 133 S. Ct. 511, 518 (2012)). The general rule that the government action must have a "legal effect" on the property interest is not one of those rules.

In urging courts to consider the "character of the government action," the Supreme Court in *Penn Central* recognized government action may impact property in myriad ways and what is important is the nature or substance of the government's action, as opposed to the precise form it may take. *Penn Cent. Transp. Co.*, 438 U.S. at 124. Unlike takings cases concerning the physical appropriation or government condemnation of property, the Supreme Court has abjured the application of rigid rules in its regulatory takings analysis. *See Goldblatt v. Town of Hempstead*, 369 U.S. 590, 594 (1962) ("There is no set formula to determine where regulation ends and taking begins.").

Moreover, the three cases cited by the Claims Court to support its general principle can be distinguished on the basis that, contrary to the case before this court, the administrative agency lacked the authority to regulate the property it "appropriated." In *A-1 Cigarette Vending*, owners and operators of tobacco vending machines filed complaints against the United States, alleging the FDA effected a temporary regulatory taking by promulgating regulations, subsequently invalidated, which banned the

sale of cigarettes and smokeless tobacco from most vending machines. 49 Fed. Cl. at 346–47. In rejecting the tobacco vending machine owners' complaint, the Claims Court determined that because the Supreme Court in *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000), ruled that the Federal Food, Drug, and Cosmetic Act did not confer authority to the FDA to regulate tobacco, tobacco vending machine owners could not sound a temporary regulatory takings claim. *A-1 Cigarette Vending*, 49 Fed. Cl. at 364 (The FDA "lack[ed] [the] authority to regulate tobacco in the first instance").

Similarly, in *Flowers Mill*, the Federal Aviation Administration ("FAA") issued a notice to a landowner, stating his proposal to erect a building on land adjacent to an airport would constitute hazard to air navigation. 23 Cl. Ct. at 184. The landowner subsequently alleged a regulatory takings claim based on the FAA's determination. *Id.* at 183. In rejecting the landowner's claim, the Claims Court found the FAA did not possess the regulatory authority to prohibit the landowner from erecting the building. According to the court, the determination was "issued by an agency with no power to prohibit or limit proposed construction." *Id.* at 189.

Finally, in *NBH Land*, landowners adjoining a military base filed a takings complaint against the government based on the actions of military officials who publicized the intent of army officials to request funds from Congress to expand the base. 576 F.2d at 318. The disclosure of this information resulted in many persons changing their actions with respect to the land, thus leading to pecuniary losses for many landowners. *Id.* The Claims Court determined the actions of the military officials did not constitute a compensable taking because Congress rejected the expansion proposals, and the military officials had no authority to act without approval of the proposal. *Id.* at 318 ("Congress has never given affirmative support or recognition of any sort to this

project."). According to the court, the government action was "not expressly authorized or directed by Congress [or] at least [] a natural consequence of Congressionally approved measures." *Id*. at 319.

The decisions in these cases cannot reasonably be extrapolated to justify the general principle proffered by the Claims Court. In all three cases, the court denied the regulatory takings claims not because the government's action did not have any legal effect, but because the agencies had *no authority to regulate*. An agency's lack of authority to regulate necessarily means its action cannot have any legal effect. *See A-1 Cigarette Vending*, 49 Fed. Cl. at 354 ("[A] takings claim cannot arise when an agency acts without congressional authority."); *United States v. N. Am. Transp. & Trading Co.*, 253 U.S. 330, 333 (1920) ("In order that the government shall be liable it must appear that the officer who has physically taken possession of the property was duly authorized so to do, either directly by Congress or by the official upon whom Congress conferred the power."); *Fla. Rock Indus., Inc. v. United States*, 791 F.2d 893, 898 (Fed. Cir. 1986); *Armijo v. United States*, 663 F.2d 90, 95 (Ct. Cl. 1981) (If the government action is unauthorized, "the acts of the defendant's officers may be enjoinable, but they do not constitute taking effective to vest some kind of title in the government and entitlement to just compensation in the owner or former owner"). However, the inverse is not true. When agencies possess congressional authority to regulate, we have recognized that agencies may engage in actions suitable for a regulatory takings claim irrespective of the fact that the action does *not* have any legal effect or impose a direct legal obligation on any party. *See A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1154 (Fed. Cir. 2014) (stating that government action *absent* a "statute, regulation, or direct order" may support a regulatory takings claim).

In *A & D Auto Sales*, former franchisees of General Motors Corporation and Chrysler LLC brought a regulatory takings claim based on allegations the government took their franchise contracts. *Id.* at 1147. The auto dealers alleged that, as a condition of the bailout of these companies during the recession and credit crisis of 2008 to 2009, the government required the auto manufacturers to terminate their franchise agreement contracts. *Id.* In determining whether coercive government action could effect a regulatory takings claim, we determined that "coercion . . . may create takings liability." *Id.* at 1154. Similarly, in *Yuba Goldfields, Inc. v. United States*, although there was no statute, regulation, or direct order, this court held that the government's action in sending a letter to the alleged holder of a mineral interest in government land, informing him that he had no extraction rights and that his dredging or removal activity was prohibited, could give rise to a regulatory takings claim. 723 F.2d 884, 885–86, 891 (Fed. Cir. 1983). Although the letter in *Yuba* was not the product of any statutory or regulatory authority, it threatened Mr. Yuba with legal recourse had he continued to mine the minerals on the land. *Id.* at 884. In finding that material fact issues existed to satisfy a takings claim, we held that the Constitution measures a taking of property not by "what [the] government said it was doing, or what it later says its intent was. . . . *What counts is what the government did.*" *Id.* at 889–90 (emphasis added) (citing *Hughes v. Washington*, 389 U.S. 290, 298 (1967) (Stewart, J., concurring)). Therefore, we reject the general principle proffered by the Claims Court because it contravenes this court's prevailing precedent and unduly narrows the regulatory takings jurisprudence.

B.  Tomato Producers' Amended Complaint Does Not Raise a Regulatory Takings Claim

We turn next to whether there has been government action sufficient to invoke a regulatory takings analysis

under *Penn Central*. The precise issue is whether the FDA's press releases issued on June 3 and June 7, 2008, together with the media briefing held on June 13, 2008, constitute government action sufficient to effect a regulatory taking. It does not.

The Tomato Producers argue that the FDA's authority to issue the press releases was an "exercise of [its] regulatory authority." Appellants' Br. 18. Although the Tomato Producers concede that the public warnings were not a "formal order," they nonetheless assert that the "actions had the practical effect" of a formal order because they "stopp[ed] all sales, purchases, and deliveries." *Id.* In the present case, the public warnings issued by the FDA via the press releases and media briefing, although themselves *not* a regulation, were based on a regulation promulgated pursuant to 21 U.S.C. § 375(b), which allows the FDA to publicize information regarding food, including produce, when "in the opinion of the [FDA], *imminent danger* to the health . . . of the consumer" exists. In interpreting what constitutes "imminent danger" or "hazard" to the public health, the FDA promulgated 21 C.F.R. § 2.5. Subsection (a) of that provision reads:

> Within the meaning of the Federal Food, Drug, and Cosmetic Act an imminent hazard to the public health is considered to exist when the evidence is sufficient to show that a product or practice, posing a significant threat of danger to health, creates a public health situation . . . that should be corrected immediately to prevent injury. . . . The *imminent hazard* may be declared at any point in the chain of events which may ultimately result in harm to the public health. The occurrence of the final anticipated injury is not essential to establish that an *imminent hazard* of such occurrence exists.

21 C.F.R. § 2.5(a).

The fact that the FDA's actions are authorized by a regulation promulgated pursuant to the publicity provision in 21 U.S.C. § 375(b) does not support the Tomato Producers' regulatory takings claim. "[A]n administrative agency's power to regulate in the public interest must *always* be grounded in a valid grant of authority from Congress." *Brown & Williamson Tobacco*, 529 U.S. at 161 (emphasis added). For the purpose of establishing a regulatory takings claim, what matters is whether the FDA's actions—the issuance of the press releases and media briefing—resulted in a *taking* of the Tomato Producers' property.

The Tomato Producers point to no taking of their property. What the Tomato Producers allege is that the FDA's June 2008 press releases and media briefing was government action sufficient to effect a regulatory taking. Appellant's Br. 4–9. However, it appears the Tomato Producers' regulatory takings claim is conditioned on the fact that the FDA was incorrect in its initial determination that the tomatoes were linked to the salmonella outbreak. Whether the FDA was correct or not in taking an action is academic to a regulatory takings analysis. *See Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1362 (Fed. Cir. 1998) ("[I]f the actions of an officer do not conflict with the terms of his valid statutory authority, then they are the actions of the sovereign, whether or not they are tortious under general law.") (citing *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949)).

The problem with the Tomato Producers' contention is that it seeks to weave a regulatory takings claim, without more, simply out of the fact that the FDA's press releases and media briefing impacted market demand for their produce. However, *any* government action such as a warning or report which provides information about a good or service is bound to impact consumer demand in the relevant market. Dissemination of information is

critical to the adequate functioning of efficient markets. The fact that the market *chooses* to incorporate all available information, without more, cannot form the basis of a regulatory takings claim. *See Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 15 (1984) ("[I]mpairment of the market value of [] property incident to otherwise legitimate government action ordinarily does not result in a taking. . . . At least in the absence of an interference with an owner's legal right to dispose of his [property], even a substantial reduction of the attractiveness of the property to potential purchasers does not entitle the owner to compensation under the Fifth Amendment."); *A-1 Cigarette Vending,* 49 Fed. Cl. at 357 ("The risks of the market prior to an actual taking are traditionally borne by the owner of the property, as 'incidents of ownership' and accordingly the reactions of third parties cannot be considered as effecting a taking.") (citing *Danforth v. United States*, 308 U.S. 271, 285 (1939)).

Unlike *A&D Auto Sales* and *Yuba*, in the case before us, there is not a prohibition or any coercive government action restricting the Tomato Producers from selling, disposing, or using their produce however they desire. What Tomato Producers effectively request is for this court to find that government action devoid of coercion, legal threat, regulatory restriction, or any binding obligation may effect a regulatory taking. We will not.

Although the FDA's press releases and media briefing adversely impacted the market demand for the Tomato Producers' tomatoes, such actions are different from one prohibiting supply, such as an FDA directive instructing the Tomato Producers not to sell their tomatoes. The latter forecloses the market entirely to the supplier. Here, the FDA's public warnings did not restrict the Tomato Producers from selling their produce, nor did it place any restriction on how they may use or dispose their tomatoes. *See Andrus v. Allard*, 444 U.S. 51, 66 (1979) ("The regulations challenged here do not compel the

surrender of the artifacts, and there is no physical invasion or restraint upon them."). Therefore, the Tomato Producers do not point to any stick in their bundle of property rights that was removed by the FDA's press releases and media briefing. *See id.* ("[I]t is crucial [to a determination of no regulatory taking] that [Appellants] retain the rights to possess and transport their property, and to donate or devise the[ir] pro[perty].") Acceptance of the Tomato Producers' contentions would take us far afield from the primary purpose of our takings jurisprudence—to determine whether a "restriction upon the use of property . . . deprives the owner of some right theretofore enjoyed." *Pa. Coal*, 260 U.S. at 417 (Brandeis, J., dissenting). The right previously enjoyed by the Tomato Producers—their ability to supply their tomatoes in the relevant market—has not changed.

Furthermore this court has recognized that in the context of the protection of public health and safety, "the private interest has traditionally been most confined and governments are given the greatest leeway to act without the need to compensate those affected by their actions." *Rose Acre Farms Inc. v. United States*, 559 F.3d 1260, 1281–82 (Fed. Cir. 2009) (citing *Jacob Ruppert, Inc. v. Caffey*, 251 U.S. 264, 303 (1920); *Purity Extract & Tonic Co. v. Lynch*, 226 U.S. 192 (1912); *N. Am. Cold Storage Co. v. City of Chicago*, 211 U.S. 306, 315 (1908)). Many federal statutes concerning the protection of the public health and safety expressly authorize federal agencies to disseminate information or publicize reports similar to the press releases and media briefing conducted by the FDA under the publicity provision of 21 U.S.C. § 375(b). *See, e.g.*, 42 U.S.C. § 242o(b), Pub. L. No. 95-353, § 310, 88 Stat. 362 (1974) (authorizing the Secretary of the Health, Education and Welfare, now knows as the Health and Human Services, to "issue information related to public health, in the form of publications or otherwise, for the use of the public, and [to] publish weekly reports of health

conditions . . . and other pertinent health information for the use of persons and institutions concerned with health services"); 15 U.S.C. § 1272(b), Pub. L. No. 86-613, § 13, 74 Stat. 372 (1960) (authorizing the United States Consumer Product Safety Commission to "cause to be disseminated information regarding hazardous substances in situations involving, in the opinion of the Commission, imminent danger to health"). In accordance with these statutes, public warnings, reports or advisories such as the FDA press releases and media briefings are frequently employed by administrative agencies. *See generally* United States Department of Health and Human Services, *The Health Consequences of Smoking—50 Years of Progress: A Report of the Surgeon General* (2014), *eral* (2014), http://www.surgeongeneral.gov/library/reports/50-years-of-progress/full-report.pdf̂ (comprehensive report chronicling the destructive consequences of fifty years of tobacco use in the United States); *Infant Deaths Prompt CSPC Warning About Sling Carriers for Babies*, United States Consumer Safety Product Commission http://www.cpsc.gov/en/Newsroom/News Releases/2010/Infant-Deaths-Prompt-CPSC-Warning-About-Sling-Carriers-for-Babies/ (last visited Aug. 14, 2015) (news release detailing the potential suffocation hazards sling carriers may pose to babies).

We are not unsympathetic to the Tomato Producers' predicament and we recognize that the FDA's actions may have inimical consequences on future parties.[5] However,

---

[5]    In its July 17, 2008 press release reversing initial warnings against eating the Tomato Producers' tomatoes, the FDA stated that it possessed "evidence showing that raw jalapeno and raw serrano peppers now available in the domestic market may be linked" to the salmonella outbreak. J.A. 62. However, on August 28, 2008, similar to the warnings concerning Appellants' tomatoes, the

to the extent the publicity of adverse information may be premature, misleading, incomplete or simply incorrect, this issue extends well beyond our regulatory takings jurisprudence, and application of it in this instance would extend the Takings Clause beyond any recognition or practicality. The creation of standards to hold agencies accountable in this context should be left to Congress. *See* Nathan Cortez, *Adverse Publicity by Administrative Agencies in the Internet Era*, 2011 BYU L. Rev. 1371, 1371 (arguing that agencies should "retain wide discretion to communicate with the public, but should be held accountable if they abuse that discretion"); Ernest Gellhorn, *Adverse Publicity by Administrative Agencies*, 86 Harv. L. Rev. 1380, 1384 (1973) ("[L]osses which may result from adverse agency publicity directed toward an entire industry are likely to be great, and concentrated public attention heightens the need for carefully conceived and well-articulated procedures.").

## CONCLUSION

In the instant case, because the Tomato Producers have failed to raise a regulatory takings claim, we affirm the dismissal of the Claims Court.

For the foregoing reasons, the decision of the Claims Court is

## AFFIRMED

---

FDA "lifted its advice to consumers to avoid eating jalapeno and Serrano peppers grown, harvested or packed in Mexico." *See Salmonella Saintpaul Outbreak*, FDA, http://www.fda.gov/NewsEvents/PublicHealthFocus/ucm179116.htm (last visited Aug. 14, 2015).